**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FANNIE MAE,

*Plaintiff*,

v.

No. 1:06-cv-02111 (RJL)

KPMG LLP,

*Defendant*.

## MEMORANDUM OF DEFENDANT KPMG LLP IN SUPPORT OF MOTION TO DISMISS FANNIE MAE'S COMPLAINT

F. Joseph Warin (D.C. Bar No. 235978)
Andrew S. Tulumello (D.C. Bar No. 468351)
Melanie L. Katsur (D.C. Bar No. 484969)
Henry C. Whitaker (D.C. Bar No. 499210)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for Defendant KPMG LLP*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ....................................................................................................... 1

BACKGROUND ....................................................................................................... 4

     A.     KPMG and Fannie Mae ................................................................. 4

     B.     OFHEO's Report and Conclusions About Fannie Mae's Accounting ................... 4

     C.     The Report Commissioned By Fannie Mae's Board of Directors ......................... 5

     D.     Fannie Mae's Admissions of Fault ......................................................... 7

     E.     The Complaint Against KPMG ............................................................. 8

SUMMARY OF ARGUMENT ..................................................................................... 9

ARGUMENT ............................................................................................................ 10

     I. Fannie Mae's Claims Against KPMG Are Barred By The Doctrines Of
       Contributory Negligence And *In Pari Delicto* ......................................... 10

         A.     The D.C. Courts Have Repeatedly Reaffirmed The Vitality Of The
               Contributory Negligence And *In Pari Delicto* Doctrines. ...................... 10

         B.     Fannie Mae Has Conceded That It Is Responsible For The
               Accounting Restatement. ...................................................... 13

     II.     Fannie Mae Is Judicially Estopped From Disavowing Its Previous
         Admissions. ................................................................................ 18

         A.     Fannie Mae Is Judicially Estopped From Denying Findings In The
               Rudman Report. ................................................................. 19

         B.     Fannie Mae Is Judicially Estopped From Denying The Accuracy Of
               Findings In The OFHEO Reports. .......................................... 21

CONCLUSION ....................................................................................................... 24

# TABLE OF AUTHORITIES

**Page**

## Cases

*Allen v. Zurich Ins. Co.*, 667 F.2d 1162 (4th Cir. 1982) .......................................... 20

*Asuncion v. Columbia Hosp.*, 514 A.2d 1187 (D.C. 1986) .......................................... 11

*Baena v. KPMG LLP*, 453 F.3d 1 (1st Cir. 2006) ................................................... 12, 16

*Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir. 1982) ................................ 11

*Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595 (6th Cir. 1982) .................................... 20

*Hall v. C&P Telephone Co.*, 793 F.2d 1354 (D.C. Cir. 1986) ....................................... 11

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) .................................. 12

*In re Dublin Sec., Inc. v. Hurd*, 133 F.3d 377 (6th Cir. 1997) ................................. 12, 16

*In re Greater Southeast Com'ty Hosp. Corp.*, 353 B.R. 324 (D.D.C. 2006) ............ 10, 13, 14

*King v. Herbert J. Thomas Memorial Hosp.*, 159 F.3d 192 (4th Cir. 1998) ................... 20

*Konstantinidis v. Chen*, 626 F.2d 933 (D.C. Cir. 1980) ........................................ 19, 20

*Krombien v. Gaili Serv. Indus., Inc.*, 317 F. Supp. 2d 14 (D.D.C. 2004) ...................... 10

*Lassiter v. District of Columbia*, 447 A.2d 456 (D.C. 1982) ....................................... 19

*M. Pierre Equip. Co. v. Griffith Consumers Co.*, 831 A.2d 1036 (D.C. 2003) ................ 11

*Macktal v. Garde*, 111 F. Supp. 2d 18 (D.D.C. 2000) ............................................... 11

*Massengale v. Pitts*, 737 A.2d 1029 (D.C. 1999) ................................................ 10, 11

*Mitchell v. Washingtonville Cent. School Dist.*, 190 F.3d 1 (2d Cir. 1999) ................... 20

*Musler v. Georgeff*, 233 F. Supp. 2d 727 (D. Md. 2002) ............................................ 19

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ......................................... 18, 19, 21, 23

*Official Comm. of Unsecured Creditors v. Coopers & Lybrand, LLP*, 322 F.3d 147 (2d Cir. 2003) ............................................................................................. 12

*Official Comm. of Unsecured Creditors v. Edwards*, 437 F.3d 1145 (11th Cir. 2006) ...... 12

*Official Comm. of Unsecured Creditors v. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001) ...... 11, 12

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*Prince Const. Co., Inc. v. District of Columbia Contract Appeals Bd.*, 892 A.2d 380 (D.C. 2006) ................................................................................................................ 19, 21

*Reynolds v. Commissioner of Internal Revenue*, 861 F.2d 469 (6th Cir. 1988) .......................... 22

*Simon v. Safelite Glass Corp.*, 128 F.3d 68 (2d Cir. 1997) ........................................... 20

*Tripp v. United States*, 257 F. Supp. 2d 37 (D.D.C. 2003) ........................................... 11

*Wager v. Pro*, 575 F.2d 882 (D.C. Cir. 1976) ......................................................... 10

## Rules

Fed. R. Civ. P. 12(b)(6) ............................................................................... *passim*

## INTRODUCTION

The circumstances surrounding Fannie Mae's accounting restatement have led to a number of different actions, involving both private litigation and regulatory investigations, and a number of different parties. Those actions may raise complex and even novel issues of accounting, law, and procedure. This action, however, fails for a very basic reason: Fannie Mae sues KPMG for failing to detect accounting errors made by Fannie Mae, errors for which Fannie Mae admits it bears at least some responsibility. Under the doctrines of contributory negligence and *in pari delicto*, which are well-recognized in this jurisdiction, such claims must fail as a matter of law. Whatever KPMG's alleged failings were in this matter, Fannie Mae, itself an admitted participant in any wrongdoing, cannot be heard to complain about them.

This complaint presents a textbook situation for applying these doctrines, but this case is much easier than anything in the case law given the findings about its own wrongdoing that Fannie Mae has expressly, repeatedly and publicly "embraced." Those admissions make this motion simple: this is a contributory negligence jurisdiction and Fannie Mae has admitted to wrongdoing.

Because the legal doctrines supporting dismissal are so well-established, and because their application to this complaint is so straightforward, this is a case in which further factual development is not appropriate or necessary to resolve this motion. Courts have repeatedly dismissed professional "malpractice" claims ***at the motion to dismiss stage*** where, as here, the complaint and other materials properly considered under Rule 12(b)(6) disclose that the client to which services were provided (or its former officers) themselves engaged in negligent, fraudulent, or otherwise improper conduct.

That is precisely the case here. The Court need go no further than Fannie Mae's complaint, which itself makes clear the contributing role Fannie Mae's management played in

the accounting treatments that led to the restatement.  The complaint expressly predicates KPMG's liability on KPMG's purported failure to adequately analyze *Fannie Mae's* "accounting policies" (Compl. ¶ 2) and to review "*Fannie Mae's* accounting" (Compl. ¶ 4).  The gravamen of the case is that KPMG allegedly "did nothing more than rubber-stamp *Fannie Mae's* internal accounting decisions" (Compl. ¶ 14).  In other words, Fannie Mae's complaint itself expressly recognizes that Fannie Mae's "management" and "internal accountants" were responsible for the company's "accounting policies" but alleges that KPMG committed "malpractice" and "breach of contract" by failing to detect the improprieties in those policies. *See* Compl. ¶¶ 25, 27, 34.

There is also much more material appropriately available to the Court on a Rule 12(b)(6) motion in which Fannie Mae has admitted fault.  To investors, the public, the Securities and Exchange Commission, and Congress, Fannie Mae has repeatedly and forthrightly acknowledged that its own management played a principal role in the accounting scandal that caused its restatement.  These admissions have both been forceful and unequivocal.  Fannie Mae's Board of Directors—publicly and without qualification—"accepted" and "embraced" the Report prepared by Senator Rudman and Paul, Weiss, Rifkind, Wharton & Garrison LLP—including, in particular, the Report's "findings and recommendations."[1]  Among the most significant "findings" in the Rudman report are that "management's accounting practices . . . were not consistent with GAAP;" that "in many instances, *management was aware of the departures from GAAP*;" and that Fannie Mae's management was "*primarily responsible* for adopting or implementing accounting practices that departed from GAAP. . .  and . . . put undue emphasis on

---

[1]  Statement by Stephen B. Ashley, February 23, 2006, available at http://www.fanniemae.com (attached hereto as Exhibit A).

avoiding earnings volatility and meeting EPS targets and growth expectations." Rudman Report, Executive Summary at 4-5 (emphasis added). Again, Fannie Mae's Board of Directors has unequivocally "accepted" and "embraced" each and every one of these "findings."

Fannie Mae also has filed financial statements with the Securities and Exchange Commission that candidly acknowledge that "our accounting [was] *designed* to show stable earnings growth and achieve forecasted earnings." *See* Fannie Mae 2006 10-K (filed Dec. 6, 2006) at 2 (emphasis added). Fannie Mae also reported to the SEC that Paul Weiss had "affirmed" that the company "had experienced breakdowns in operational controls that *contributed* to our accounting failures and safety soundness problems." *See id*. at 168 (emphasis added).

Finally, the OFHEO reports—of which Fannie Mae has successfully persuaded this Court to take judicial notice—conclude that Fannie Mae's "senior executives worked strenuously to hide Fannie Mae's operational deficiencies, significant risk exposures, and improper earnings management *[from among others] its external auditor," KPMG*. Final OFHEO Report at 34 (emphasis added).

Fannie Mae's previous admissions in all of these venues judicially estop it from denying those facts today. The doctrine of judicial estoppel precludes litigants from playing "fast and loose" with the courts by changing stories whenever it suits them, and Fannie Mae thus cannot now change its story by disavowing these admissions.

The Rudman Report, the SEC filings, and the OFHEO reports simply confirm what Fannie Mae's complaint already concedes. There could scarcely be a more appropriate case for application of the contributory negligence and *in pari delicto* doctrines. This case should be dismissed.

# BACKGROUND

## A.     KPMG and Fannie Mae

Fannie Mae is a for-profit, shareholder-owned, federally chartered corporation that engages in financial activities in the secondary mortgage market. KPMG is an accounting firm that served as Fannie Mae's auditor. Fannie Mae's claims in this case arise from audit services KPMG provided to Fannie Mae from 2001 to 2004 pursuant to annual audit engagement agreements. Compl. ¶¶ 35, 113.

According to Fannie Mae's complaint, its financial statements for those years contained numerous errors. The details of these alleged errors have been the subject of a number of highly publicized investigations.

## B.     OFHEO's Report and Conclusions About Fannie Mae's Accounting

In September 2004, as part of a voluminous report, Fannie Mae's principal regulator, the Office of Federal Housing Enterprise Oversight ("OFHEO"), concluded that from 1998 to 2004, Fannie Mae repeatedly and intentionally manipulated accounting principles to achieve earnings targets and to portray Fannie Mae as a business that generated stable earnings over time. OFHEO Interim Report, at i ("Interim Report"). Specifically, the report concluded that Fannie Mae's "misapplications of GAAP [were] not limited occurrences, but [were] pervasive and [were] reinforced by management." *Id.*

OFHEO's investigation culminated in the release of a final report ("Final OFHEO Report") on May 23, 2006. The Final OFHEO Report determined that deceiving KPMG about its accounting policies was a key component of Fannie Mae's conduct between 1998 and 2004. Indeed, the Final OFHEO Report concluded that Fannie Mae's "***senior executives worked strenuously to hide Fannie Mae's operational deficiencies, significant risk exposures, and***

*improper earnings management . . . from [among others] its external auditor," KPMG*.  Final

OFHEO Report at 34 (emphasis added).

      The Report also made the following findings:

- "Despite representations to the contrary, Fannie Mae management knew of information that might impact the GAAP representation of the Enterprise's financial statements, ***but failed to provide this to the external auditors***."  Final OFHEO Report at 248 (emphasis added);

- Fannie Mae "made every effort to keep [its] analysis confidential."  Final OFHEO Report at 124;

- "[S]enior management at Fannie Mae misapplied GAAP [and] ***diverted KPMG's attention from that misapplication***."  Final OFHEO Report at 125 (emphasis added);

- "Fannie Mae misapplied GAAP" and its "reaction was ***to avoid calling KPMG's attention to the matter*** . . . ."  Final OFHEO Report at 139 (emphasis added);

- From 1998 to mid-2004, "***Fannie Mae senior management systematically withheld information*** about the Enterprise's operations and financial condition ***from . . . its external auditors***, OFHEO, the Congress, and the public—or disclosed information that was incomplete, inaccurate or misleading.  That prevented others from becoming aware of Fannie Mae's earnings management strategies [and] the fact that the Enterprise's accounting policies did not comply with GAAP . . . ."  Final OFHEO Report at 245 (emphasis added);

- Fannie Mae's senior management "***neglected to inform KPMG about accounting treatments that they knew did not conform to GAAP***.  The withholding of such information ***critically impaired [KPMG's] ability to detect and correct accounting deficiencies and internal control weaknesses*** and was an unsafe and unsound practice."  Final OFHEO Report at 249 (emphasis added).

      In sum, OFHEO found that "Fannie Mae kept KPMG in the dark about the Enterprise's

misapplication of GAAP," Final OFHEO Report at 135, and that "personnel in Fannie Mae's

Office of the Controller were knowingly misapplying GAAP," Final OFHEO Report at 140.

## C.    The Report Commissioned By Fannie Mae's Board of Directors

      Shortly after OFHEO's Interim Report was released in September 2004, a Special

Review Committee of Fannie Mae's Board of Directors commissioned Senator Warren Rudman

and the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") to investigate

the conduct of Fannie Mae's management.  Compl. ¶ 67.  That investigation produced a detailed,

615-page report—the so-called "Rudman Report"—which also concluded that Fannie Mae's

management engaged in a scheme to manage earnings.

In the Report, Paul Weiss concluded that "management's accounting practices . . . were

not consistent with GAAP, and, in many instances, ***management was aware of the departures***

***from GAAP***."  Rudman Report, Executive Summary, at 4 (emphasis added).  The Report also

concluded that "evidence amply support[ed] the conclusion that management's adoption of

certain accounting policies and financial reporting procedures was motivated by a desire to show

stable earnings growth, achieve forecasted earnings, and avoid income statement volatility."  *Id.*

Indeed, the Rudman Report is replete with illustrations of Fannie Mae's knowing

misapplication of accounting policies to manipulate its financial reporting.

- "[M]anagement did not alter its accounting practice . . . ***even though*** management was aware that the allowance was overstated, because the reduction of the allowance would have generated a 'spike' in income."  Rudman Report, Executive Summary, at 4 (emphasis added); *see also* Compl. ¶ 72(g) (referring to accounting for loan losses).

- "[M]anagement disregarded the terms of [its FAS 91 policy] when [they] did not suit its purpose."  Rudman Report, Executive Summary, at 7; *see also* Compl. ¶ 72(d) (alleging Fannie Mae's FAS 91 accounting errors);

- "[M]anagement, with Howard's support and with the knowledge of senior managers in the Controller's Office, [] adopt[ed] an approach to hedge accounting that deviated from the standard's clear requirements in numerous and important respects."  Rudman Report, Executive Summary, at 7.

The Rudman Report concluded that Fannie Mae's management was "***primarily***

***responsible*** for adopting or implementing accounting practices that departed from GAAP, and

that [it] put undue emphasis on avoiding earnings volatility and meeting EPS targets and growth

expectations."  Rudman Report, Executive Summary, at 5 (emphasis added).

**D.      Fannie Mae's Admissions of Fault**

Fannie Mae has acknowledged that "these findings are disturbing, disappointing, and very serious," but has publicly and unequivocally stated that "***the Board accepts and embraces the <u>report</u>, <u>its findings</u>, and <u>its recommendations</u>*** . . . ." *See* Exhibit A (emphasis added). Indeed, the Chairman of Fannie Mae's Board of Directors explained that "[t]he Board gave Paul, Weiss unrestricted authority to take this investigation wherever it led, and leave no stone unturned," and declared that the "report speaks for itself." "It sets forth the facts and lays out a clear, detailed picture of what went wrong at Fannie Mae, ***why it happened***, and what needs fixing." *Id.* (emphasis added). The President and Chief Executive Officer of Fannie Mae, Daniel H. Mudd also conceded that, among other things, "the report confirms that many of our problems were rooted in our corporate culture."[2]

In its public filings with the SEC, Fannie Mae stated that the Rudman Report found that its "accounting practices in many areas were not consistent with GAAP, and aspects of [Fannie Mae's] accounting were ***designed*** to show stable earnings growth and achieve forecasted earnings." Fannie Mae 2006 10-K (filed Dec. 6, 2006) at 2 (emphasis added). The Company further explained that "OFHEO's September 2004 interim report on its special examination concluded that we had experienced breakdowns in operational controls that contributed to our accounting failures and safety and soundness problems" and that "Paul Weiss's independent investigation into the issues raised in OFHEO's interim report affirmed this conclusion." *Id.* at 168.

---

[2]  Statement by Daniel H. Mudd (Feb. 23, 2006), available at www.fanniemae.com (attached hereto at Exhibit B).

Fannie Mae also testified about these matters before the Congress of the United States. In that testimony, Fannie Mae repeatedly acknowledged that its own conduct contributed to the problems leading to the accounting restatement.  For example, on June 15, 2006, Fannie Mae's President and Chief Executive Officer, Daniel H. Mudd, testified before the U.S. Senate Committee on Banking, Housing and Urban Affairs that "[t]he final OFHEO report, and the special investigation by former Senator Warren Rudman and the law firm of Paul Weiss for our Board of Directors, have provided a detailed picture of the failings at Fannie Mae during the years 1998 through 2004."[3]  Acknowledging the detailed nature of the OFHEO and Rudman Reports, he further testified that "[i]t is clear from the reports that *Fannie Mae* got a lot of things wrong from 1998 to 2004."  *Id.* (emphasis added).  Mudd further told the committee that Fannie Mae would "fix [its] corporate culture, which the OFHEO report makes clear led to a lot of our problems."  *Id.*  Mudd also recognized that Fannie Mae was responsible for its accounting, testifying that "[b]ad decisions about accounting and many other matters let a lot of people down, and in doing so, broke a public trust."  *Id*.

Mudd also professed that "we have learned some painful lessons about getting things right, and about hubris and humility."  *Id.*

**E.     The Complaint Against KPMG**

This action was filed on December 12, 2006, in the D.C. Superior Court.  KPMG removed the action on the same day to this Court.  The gravamen of the complaint is that KPMG "did nothing more than rubber-stamp *Fannie Mae's* internal accounting decisions" (Compl. ¶ 14).  Time and again, Fannie Mae complains that KPMG failed adequately to analyze *Fannie*

---

[3]  Opening Statement Prepared for Delivery by Daniel H. Mudd, June 15, 2006, available at http://www.fanniemae.com (attached hereto at Exhibit C).

*Mae's* "accounting policies," Compl. ¶ 2 (emphasis added) and to review "***Fannie Mae's***

accounting," Compl. ¶ 4 (emphasis added); *see also* Compl. ¶ 25 (alleging that external auditors

review "the accounting policies and practices of ***the company's*** management and internal

accountants") (emphasis added); Compl. ¶ 28 (alleging that it is improper for external auditors to

rely on "the conclusions and representations of [the] ***company's*** management") (emphasis

added); Compl. ¶ 34 (alleging that KPMG "unreasonably relied ***on management***") (emphasis

added); Compl. ¶ 100 (KPMG failed to determine "that Fannie Mae's accounting policies and

practices departed from the requirements of GAAP in multiple areas . . .") (emphasis added).

## SUMMARY OF ARGUMENT

Fannie Mae's complaint should be dismissed under the doctrines of contributory

negligence and *in pari delicto*. As the complaint itself makes clear, the theory of Fannie Mae's

purported "malpractice" and "breach of contract" action is that KPMG failed to deter Fannie

Mae's "management" and "internal accountants" from implementing "accounting policies" and

adopting accounting positions that did not comply with GAAP. That theory expressly

presupposes and acknowledges contributory fault on the part of Fannie Mae's management.

Under D.C. law, no more is required to trigger the contributory negligence or *in pari delicto* bars.

The application of these doctrines is underscored by Fannie Mae's admissions in

connection with the Rudman Report, the OFHEO Reports, congressional testimony, and SEC

filings. Fannie Mae has expressly adopted the findings of the Rudman Report, which

unequivocally concluded that Fannie Mae's management was "primarily responsible" for

adopting accounting positions and policies that did not comply with GAAP. Fannie Mae's

filings with the SEC also have conceded that Fannie Mae's accounting was "designed" by Fannie

Mae's management to "show stable earnings growth and achieve forecasted earnings." Fannie

Mae 2006 10-K (filed Dec. 6, 2006) at 2. The OFHEO Reports further confirm that Fannie

Mae's financial statements did not comply with GAAP, that Fannie Mae's management knew

that they did not comply with GAAP, and that Fannie Mae withheld material information from

KPMG.

This is precisely the kind of lawsuit the doctrines of contributory negligence and *in pari*

*delicto* were designed to prevent. Fannie Mae cannot escape that fact by twisting the allegations

of its own complaint or prevaricating about its prior admissions. The complaint should be

dismissed.

## ARGUMENT

**I.     Fannie Mae's Claims Against KPMG Are Barred By The Doctrines Of Contributory Negligence And *In Pari Delicto*.**

Fannie Mae's own complaint, standing alone and considered along with facts that it has

officially admitted and is estopped from contesting, demonstrate that Fannie Mae's claims

against KPMG are barred by the doctrines of *in pari delicto* and contributory negligence.

### A.     The D.C. Courts Have Repeatedly Reaffirmed The Vitality Of The Contributory Negligence And *In Pari Delicto* Doctrines.

Fannie Mae's negligence and breach-of-contract action arises under D.C. law. D.C. law

provides that a "plaintiff's contributory negligence is a ***complete bar*** to recovery." *Massengale*

*v. Pitts*, 737 A.2d 1029, 1032 (D.C. 1999) (emphasis added); *see also Krombien v. Gaili Serv.*

*Indus., Inc.*, 317 F. Supp. 2d 14, 18 (D.D.C. 2004) (applying D.C. law). D.C. law also observes

"'the legal principle of *in pari delicto*," which "holds that if the parties are in equal fault, the law

will help neither of them.'" *In re Greater Southeast Comty. Hosp. Corp.*, 353 B.R. 324, 361-62

(D.D.C. 2006) (quoting *Wager v. Pro*, 575 F.2d 882, 884 (D.C. Cir. 1976)); *see also id.* at 361

n.59 (describing D.C. law).

While some jurisdictions have altered the traditional common law rule of contributory

negligence in favor of a regime of "comparative negligence," the District "is not a comparative

negligence jurisdiction." *M. Pierre Equip. Co. v. Griffith Consumers Co.*, 831 A.2d 1036, 1038 (D.C. 2003). Rather, this jurisdiction "*is a pure contributory negligence jurisdiction* . . . ." *Massengale*, 737 A.2d at 1031 (emphasis added). This Court, of course, is bound by the D.C. Court of Appeals' consistent reaffirmation of the continuing vitality of both the strict contributory negligence and *in pari delicto* doctrines. *See, e.g.*, *Hall v. C&P Telephone Co.*, 793 F.2d 1354, 1356-57 (D.C. Cir. 1986) (decisions of the D.C. Court of Appeals bind federal courts on questions of substantive D.C. law); *Tripp v. United States*, 257 F. Supp. 2d 37, 42 (D.D.C. 2003) (to resolve questions of state and local law, a district court "must seek to discern . . . how the D.C. Court of Appeals would rule on the issue").

Nor does it matter that Fannie Mae has pleaded "malpractice" together with "breach of contract" actions. The contributory negligence and *in pari delicto* bars apply to both. Under D.C. law, "in professional malpractice cases, alleged negligence and breach of contract are typically premised on the same duty of care and, as a consequence, should typically lead to the same legal result." *Asuncion v. Columbia Hosp. For Women*, 514 A.2d 1187, 1191 (D.C. 1986); *see also Macktal v. Garde*, 111 F. Supp. 2d 18, 22-23 (D.D.C. 2000), *aff'd*, No. 00-7207, 2001 WL 238170 (D.C. Cir. Feb. 23, 2001) ("if plaintiff is unable to prove his professional negligence claim, contract and tort claims which are essentially restatements of the failed malpractice claim must also fail"); *Official Comm. of Unsecured Creditors v. Lafferty & Co.*, 267 F.3d 340, 355 (3d Cir. 2001) (noting that one "can legitimately speak of one doctrine, *in pari delicto*, across the different claims because the analysis under the various causes of action will typically be the same"); *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 453 (7th Cir. 1982) ("Despite the plurality of charges it is one question because breach of contract, negligence, and fraud, when

11

committed by auditors, are a single form of wrongdoing under different names.").  Thus, in the

District of Columbia, the doctrines are fully applicable to all of Fannie Mae's claims.

Finally, courts have held that where the circumstances show that plaintiff shares blame

for the alleged wrongs, there is no reason to postpone the inevitable dismissal of the claims.

Indeed, courts in a number of different jurisdictions have dismissed *at the 12(b)(6) stage*

complaints brought by companies against accounting firms and law firms where the company's

management shared responsibility for the alleged wrongdoing:

- *Official Comm. of Unsecured Creditors v. Edwards*, 437 F.3d 1145, 1155 (11th Cir. 2006) (affirming grant of 12(b)(6) motion to dismiss RICO claims against banks for failure to uncover company's fraudulent scheme under the *in pari delicto* doctrine, on the ground that the company itself instigated and perpetrated the scheme);

- *Baena v. KPMG LLP*, 453 F.3d 1, 7 (1st Cir. 2006) (affirming 12(b)(6) grant of motion to dismiss a state law claim against accounting firm for failure to uncover a company's earnings management on *in pari delicto* grounds because this was a "fraud by top management to overstate earnings," and because the company's chairman, CEO, and managing directors "were all knowing parties to the financial statements");

- *Official Comm. of Unsecured Creditors v. Coopers & Lybrand, LLP*, 322 F.3d 147, 163-64 (2d Cir. 2003) (affirming 12(b)(6) grant of motion to dismiss state-law claims against accountant for failing to discover unrealistic financial projections on the ground that the company's controlling shareholders were themselves responsible for the transaction and dictated its terms and conditions);

- *Official Comm. of Unsecured Creditors v. Lafferty & Co.*, 267 F.3d 340, 359-60 (3d Cir. 2001) (affirming 12(b)(6) dismissal of claims brought against professionals—including an accounting firm—for failure to uncover and disclose a Ponzi scheme that bankrupted the company, on the ground that the scheme was perpetrated by the company's controllers and therefore barred by the doctrine of *in pari delicto*);

- *In re Dublin Sec., Inc. v. Hurd*, 133 F.3d 377, 380 (6th Cir. 1997) (affirming grant of 12(b)(6) motion dismissing malpractice claim on the ground of *in pari delicto* where the predecessor corporation's own officers were "instrumental in perpetrating the fraud on the individuals choosing to invest in the Dublin Securities schemes," in spite of the plaintiff's argument that "in order to reach such a determination, a fact-finding inquiry is necessary . . .");

- *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094-95 (2d Cir. 1995) (affirming grant of motion to dismiss accounting malpractice claim on the ground of *in pari delicto* because the "[bankruptcy trustee] is precluded from asserting the professional malpractice

claims alleged in the Complaint because of the [predecessor partnership's] collaboration with the defendants-appellees in promulgating and promoting the [plaintiffs'] schemes");

- *In re Greater Southeast Comty. Hosp. Corp.*, 353 B.R. 324, 369 (D.D.C. 2006) (granting 12(b)(6) motion to dismiss malpractice claim on the ground of *in pari delicto* "because the very harm that [plaintiffs] allegedly suffered at the hands of the Law Firm Defendants . . . presupposes imputable wrongdoing by the debtors' management," despite the plaintiff's argument that this defense "is factually intensive and cannot be resolved on a motion to dismiss").

As demonstrated below, these cases—and the principles they apply—show that there is no reason to postpone the inevitable here.

### B.    Fannie Mae Has Conceded That It Is Responsible For The Accounting Restatement.

No innovation is required to find that the principles of contributory negligence and *in pari delicto* require the dismissal of Fannie Mae's complaint against KPMG. The core theory of Fannie Mae's complaint is that KPMG failed to detect and prevent misconduct by Fannie Mae's management. Thus, Fannie Mae complains that KPMG "did nothing more than rubber-stamp *Fannie Mae's* internal accounting decisions . . . ." Compl. ¶ 14. Throughout its pleadings, Fannie Mae objects to KPMG's failure to object to Fannie Mae's "policies" and "accounting". *See, e.g.*, Compl. ¶ 2 (KPMG did not adequately analyze *Fannie Mae's* "accounting policies") (emphasis added); Compl. ¶ 4 (KPMG purportedly failed to adequately analyze and to review "*Fannie Mae's* accounting") (emphasis added); Compl. ¶ 25 (alleging that external auditors review "the accounting policies and practices of *the company's* management and internal accountants") (emphasis added); Compl. ¶ 28 (alleging that it is improper for external auditors to rely on "the conclusions and representations of [the] *company's* management") (emphasis added); Compl. ¶ 34 (alleging that KPMG "unreasonably relied *on management*") (emphasis added); Compl. ¶ 100 (KPMG failed to determine "that Fannie Mae's accounting policies and practices departed from the requirements of GAAP in multiple areas") (emphasis added).

13

Indeed, to make the nature of its claims absolutely clear, Fannie Mae alleges that they involve the same kind of conduct as the audits of two other KPMG clients, Xerox and Gemstar. Thus, Fannie Mae alleges KPMG "knew or should have known of improper 'top side' accounting adjustments made by Xerox management in order to meet earnings targets." Compl. ¶ 50. Likewise, KPMG allegedly "unreasonably rel[ied] on the representations of Gemstar's management." Compl. ¶ 103. According to Fannie Mae, just as KPMG allegedly failed "to identify earnings management at Xerox," Compl. ¶ 104, it failed to find earnings management at Fannie Mae.

An allegation that the client's conduct—here, the preparation of financial statements by sophisticated senior executives charged with responsibility for them—caused an error that the professional failed to catch is *precisely* the kind of claim that the contributory negligence and *in pari delicto* doctrines bar. For example, in *In re Greater Southeast Community Hosp.*, a recent case decided under D.C. law, a trustee brought a malpractice action against the lawyers of a former client. Investors were defrauded of millions of dollars as a result of investments made by the company, but the trustee attempted to place blame for the fraud on the *law firm* that had allegedly *facilitated* those investments by negligently preparing certain opinion letters. 353 B.R. at 334. The court granted the law firm's 12(b)(6) motion to dismiss the malpractice action on the ground that the "very harm" that the company allegedly suffered as a result of alleged wrongdoing of the law firm "presuppose[d] imputable wrongdoing by the debtor's management," *id.* at 369, which barred the malpractice claim. Fannie Mae's allegations likewise "presuppose imputable wrongdoing" by Fannie Mae's management in the preparation of its own financial statements.

Thus, even if this Court were to consider such statements in a vacuum, they would require the dismissal of the complaint.  But this complaint is ***not*** presented in a vacuum.  Indeed, this plaintiff has been uniquely vocal about the very matters that underlie its complaint against KPMG.  Its public filings and sworn testimony make clear that the admissions in the complaint are not mere pleading errors.  To the contrary, if anything, the complaint systematically understates what Fannie Mae has "embrace[d]" in one forum after another:

- There was "evidence amply supporting the conclusion that management's adoption of certain accounting policies and financial reporting procedures was motivated by a desire to show stable earnings growth, achieve forecasted earnings, and avoid income statement volatility."  Rudman Report, Executive Summary at 4;

- "[I]n many instances, management was aware of the departures from GAAP."  Rudman Report, Executive Summary, at 4;

- "Howard and Spencer were ***primarily responsible*** for adopting or implementing accounting practices that departed from GAAP" and they "put undue emphasis on avoiding earnings volatility and meeting EPS targets and growth expectations."  Rudman Report, Executive Summary, at 5 (emphasis added);

- "[M]anagement did not alter its accounting practice . . . ***even though*** management was aware that the allowance was overstated, because the reduction of the allowance would have generated a 'spike' in income."  Rudman Report, Executive Summary, at 4 (emphasis added);

- "[M]anagement disregarded the terms of [its FAS 91 policy] when [they] did not suit its purpose."  Rudman Report, at 7;

- "[T]he Company's historical accounting for LIHTC had not been GAAP-compliant, as management knew."  Rudman Report, at 62.

In its public filings with the SEC, Fannie Mae reported that its management had implementing "accounting practices in many areas were not consistent with GAAP, and aspects of [Fannie Mae's] accounting were designed to show stable earnings growth and achieve forecasted earnings."  Fannie Mae 2006 10-K (filed Dec. 6, 2006) at 2.  Fannie Mae further reported "breakdowns in operational controls that ***contributed to our accounting failures*** and safety and soundness problems."  *Id.* at 168 (emphasis added).

15

This conduct clearly establishes a sufficient basis to apply the contributory negligence and *in pari delicto* bars. As the First Circuit recently concluded, misconduct designed "to overstate earnings, and so to facilitate stock sales," is plainly the sort of conduct that precludes that company from overcoming an *in pari delicto* defense when it sues its auditor for failing to uncover the earnings management scheme. *See Baena*, 453 F.3d at 7 (affirming grant of motion to dismiss state law accounting misconduct claim on grounds of *in pari delicto*); *see also PricewaterhouseCoopers*, 2007 WL 141059, at *8 (dismissing a company's malpractice action against its auditor where the company's senior management knew the financial statements presented to the auditor were false, "directed the improper entries," and "was aware of the entries").

Similarly, in *In re Dublin Securities*, the Third Circuit applied the *in pari delicto* bar to dismiss a malpractice suit brought against a law firm that handled an initial public stock offering. The company fraudulently carried out the offerings; the company went bankrupt; and the bankruptcy trustee, standing in the shoes of the debtor-company, sued the law firm. 133 F.3d at 379. The court sustained the law firm's *in pari delicto* defense on the pleadings against a debtor's claims because "the debtor's own actions were instrumental in perpetrating the fraud . . . ." *Id.* at 380.

Moreover, these reports go further—much further—and show that Fannie Mae **also** actively and repeatedly concealed material matters from KPMG and affirmatively misled KPMG:

- "Management did not fully disclose its motivation or all of the material facts relating to its IO MBS accounting to the outside auditor," KPMG. Rudman Report, Executive Summary at 15;

- In order to avoid showing hundreds of millions in losses on its IO securities and buy-ups when interest rates fell, "senior management at Fannie Mae misapplied GAAP, diverted

KPMG's attention from that misapplication, and provided incomplete information about its IO accounting [regulators]." Final OFHEO Report at 125;

- Fannie Mae even tried to prevent KPMG from doing work for Freddie Mac in 2002 because it feared that the comparison would reveal Fannie Mae's improper accounting. Final OFHEO Report at 135 (An e-mail from Spencer to Howard explained that "[t]here is at least one thing that we know of where we have a favorable accounting treatment and that is on the IO's we have on our books.  Freddie is doing IO accounting and we are not. KPMG hasn't figured that out—but Jonathan reminded me of this.");

- "We haven't informed KPMG that we intend to implement this next year and our preference would be to not talk to them about it prior to year-end 1998 so they don't say 'book it' at year-end.  We've limited discussion of this to the inner circle, so wouldn't want to broadcast it to the officer group at this point." Final OFHEO Report at 174;

- "KPMG has apparently forgotten about these transactions, and we have not brought these issues to their attention . . . .  We have made every effort to keep our analysis confidential." Final OFHEO Report at 124;

- Howard, Spencer, Boyles and Pennewell told KPMG that the $199 million in FAS 91 adjustments should be deferred because of model deficiencies—that the calculations were "subjective" and "complicated and imprecise"—when, in fact, their true motive was to enrich themselves by meeting bonus targets.  Final OFHEO Report at 40, 169-72.

According to OFHEO, the bottom line is that Fannie Mae's management's engaged in "strenuous[] [efforts] to hide Fannie Mae's operational deficiencies, significant risk exposures, and improper earnings management to smooth earnings from outside observers—the Board of Directors, *its external auditor*, OFHEO, the Congress, and the public."  Final OFHEO Report at 34 (emphasis added).  Testifying under oath before Congress, Fannie Mae admitted that these facts "provide[] a detailed picture of the failings at Fannie Mae during the years 1998 through 2004" and that "[b]ad decisions about accounting and many other matters let a lot of people down, and in doing so, broke a public trust."[4]  Again, there could scarcely be a more appropriate

---

[4] Opening Statement Prepared for Delivery by Daniel H. Mudd, June 15, 2006, available at http://www.fanniemae.com (attached hereto at Exhibit C).

and deserving case for applying the contributory negligence and *in pari delicto* bars than this one.

## II.    Fannie Mae Is Judicially Estopped From Disavowing Its Previous Admissions.

Given that the doctrines of contributory negligence and *in pari delicto* in this District are well-accepted, and their application to the claims here straightforward, Fannie Mae will no doubt struggle mightily to avoid its own statements and attempt to disavow in ***this*** Court the Rudman Report whose findings it has publicly and forthrightly "adopted and embraced."  That argument is wholly unavailing.

First and foremost, the complaint itself—standing alone and considered without regard to Fannie Mae's admissions in other settings—is more than sufficient to warrant application of the contributory negligence and *in pari delicto* defenses.  While KPMG could have ended its motion there, the additional materials from the reports, as well as Fannie Mae's own public filings and sworn testimony, make clear that these allegations mean just what they say:  that Fannie Mae is suing KPMG for allegedly failing to stop Fannie Mae's own wrongdoing.  Whatever fault KPMG may allegedly bear for Fannie Mae's accounting—and there are more than enough other lawsuits and investigations pending to determine that matter—the law of the District is clear that Fannie Mae cannot be heard to complain about it.

In addition, to the extent the Court wishes to consider the admissions made by Fannie Mae with respect to the Rudman and OFHEO Reports in SEC and other filings, it can do so without concern that Fannie Mae can simply "disavow" those admissions in its opposition brief. The doctrine of judicial estoppel precludes Fannie Mae from playing "fast and loose" with the Court by denying the truth and accuracy of reports that it has elsewhere conceded.  *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (judicial estoppel is "an equitable doctrine

invoked by a court at its discretion" and "is intended to prevent improper use of judicial

machinery" (quotation marks and citations omitted)).

Judicial estoppel is a broad equitable doctrine, and its "purpose is to protect the integrity

of the judicial process by prohibiting parties from deliberately changing positions according to

the exigencies of the moment." *Id.* at 749-50 (quotations marks and citations omitted).

Accordingly, it is a doctrine "that does not require proof of privity, reliance, or prejudice."

*Konstantinidis v. Chen*, 626 F.2d 933, 937 (D.C. Cir. 1980).  This Court looks to D.C. law when

determining whether judicial estoppel applies, and the District of Columbia Court of Appeals has

embraced the federal framework for judicial estoppel.  *Prince Const. Co. v. District of Columbia

Contract Appeals Bd.*, 892 A.2d 380 (D.C. 2006) (applying judicial estoppel to bar a party from

taking a legal position inconsistent with its position in a different proceeding); *Lassiter v.

District of Columbia*, 447 A.2d 456 (D.C. 1982) (applying judicial estoppel to bar a party from

asserting a factual claim inconsistent with his prior testimony).

> ### A.    Fannie Mae Is Judicially Estopped From Denying Findings In The Rudman Report.

Fannie Mae's repeated embrace of the Rudman Report is grounds for judicially estopping

it from repudiating that Report's "findings."  Fannie Mae has publicly adopted the findings and

recommendations in the Report, and it has filed documents with the SEC acknowledging the

Report's findings and recommendations.  It is well settled that judicial estoppel can be used to

protect the judicial process from contrary statements and positions taken in previous court filings

and in statements made outside of court.  *See, e.g.*, *Musler v. Georgeff*, 233 F. Supp. 2d 727, 731

(D. Md. 2002) ("The Fourth Circuit has held that judicial estoppel is appropriate where the party

makes a statement to a government agency inconsistent with an assertion in litigation with a

private party.") (citing *King v. Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 197-98 (4th Cir.

1998)).  Indeed, this doctrine can apply even to unsworn statements if doing so is necessary "to prevent intentional inconsistency" because "the object of the rule is to protect the judiciary, as an institution, from the perversion of judicial machinery."  *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982); s*ee also Konstantinidis*, 626 F.2d at 937; *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166-67 (4th Cir. 1982) (applying judicial estoppel to prevent a plaintiff from denying statements made before the South Carolina Industrial Commission, in a deposition, and before the state court).

Courts have repeatedly held that facts in statements to administrative agencies—such as Fannie Mae's statements to the SEC—are ample grounds for judicially estopping a party from later denying those very facts.  *See Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2d Cir. 1997) ("Numerous decisions have approved the application of judicial estoppel where the prior statements were made in administrative or quasi-judicial proceedings.").  Courts have routinely held that statements in an application for Social Security benefits, for instance, cannot be denied in a later judicial proceeding.  *See Mitchell v. Washingtonville Cent. School Dist.*, 190 F.3d 1 (2d Cir. 1999) (applying judicial estoppel to statements made to the Social Security Administration and noting that "[t]o rule otherwise might leave the implication that someone who feels himself in need of further income is free to misrepresent important information to the Social Security Administration"); *Simon*, 128 F.3d at 72.

### B.    Fannie Mae Is Judicially Estopped From Denying The Accuracy Of Findings In The OFHEO Reports.

Fannie Mae's repeated motions asking this Court to take judicial notice of the Interim Report also constitute a basis for applying judicial estoppel.[5]  Judicial estoppel traditionally focuses on three factors:

*First*, whether "a party's later position must be 'clearly inconsistent' with its earlier position";

*Second*, whether "the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that . . . the . . . court was misled'"; and

*Third*, "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *New Hampshire*, 532 U.S. at 750-51 (citations omitted); *see also Prince Const. Co., Inc.*, 892 A.2d at 386 n.6.  All three of these factors are present here.

With respect to the first factor, any attempt by Fannie Mae to dispute the accuracy of the OFHEO Reports would be inconsistent with its earlier motions in this Court seeking judicial notice of the Interim Report and relying upon the factual accuracy of that Report.  Fannie Mae asked this Court to take judicial notice of the Interim Report in support of its first motion to dismiss the class action complaint, stating that the OFHEO Reports "are public documents ***whose accuracy cannot be questioned*** . . . ."  Motion for Judicial Notice, May 3, 2005, D.E. 78 (emphasis added).  Fannie Mae again asked this court to take judicial notice of OFHEO's reports on May 15, 2006, Fannie Mae and Director Defendants' Joint Request for Judicial Notice, D.E.

---

[5]  *See* Fannie Mae's Motion for Judicial Notice, May 3, 2005, D.E. 78.

154, and on August 17, 2006, Fannie Mae and Director Defendants' Joint Request for Judicial Notice, D.E. 214.

With respect to the second factor, there can be no dispute that Fannie Mae was successful in its request for judicial notice, as this Court granted the request for judicial notice of the multiple OFHEO Reports, including the OFHEO Interim Report.  Order, February 10, 2006, D.E. 115 at 2 (Fannie Mae's request for judicial notice is granted).[6]  That the motion to dismiss itself was denied does not alter that result.  *Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469, 472 (6th Cir. 1988) (The requirement that a party succeed in its argument "does not mean that the party against whom the judicial estoppel doctrine is to be invoked must have prevailed on the merits.  'Rather, judicial acceptance means only that the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition.'" (citations omitted)).

Notably, Fannie Mae did ***not*** seek judicial notice of the Interim Reports and other OFHEO reports simply as mere "background" or "context."  Rather, Fannie Mae expressly relied on the Interim Report for the ***accuracy of its factual statements*** in its motion to dismiss and turned to OFHEO's reports for facts necessary to defend its FAS 91 policy.  For example, in response to allegations it had ignored the concerns of Roger Barnes, Fannie Mae responded by asserting facts from the OFHEO Interim Report that directly contradicted the allegations in the complaint:

> As the OFHEO Report recounts, Fannie Mae's Internal Audit Division conducted a full review of the controls over changes in amortization factors and alleged amortization factor anomalies.  (**OFHEO Report at 73**).  This internal

---

[6] Fannie Mae's subsequent requests for judicial notice were ultimately mooted, as Fannie Mae subsequently withdrew its motions to dismiss the Franklin and Evergreen complaints.

> investigation involved a number of procedures to evaluate the issues raised by Mr.
> Barnes . . . ." (*Id*. at 74-75.)  Plaintiffs attempt to dismiss Fannie Mae's diligence
> in investigating Mr. Barnes' issues by claiming that the Internal Audit Division's
> investigation was "incomplete, perfunctory, and ineffective." (Compl. ¶ 131.)
> Although the OFHEO Report concluded that Fannie Mae could have been more
> diligent in conducting its investigation, (**OFHEO Report at 73**), OFHEO did not
> conclude that the investigation was motivated by an improper purpose.

Fannie Mae's Mot. to Dismiss, at 38 (emphasis added); *see also* Fannie Mae's Mot. to Dismiss at

39 ("As the OFHEO report explains, Mr. Barnes' allegations were also discussed thoroughly

during an 'all hands' meeting on August 8, 2003 . . . .").  This reliance on the Interim Report

shows the importance that Fannie Mae placed on the factual accuracy of findings in the OFHEO

Reports.  And having relied on OFHEO's factual findings to seek dismissal of the securities class

action, Fannie Mae cannot now dispute the accuracy of OFHEO's factual findings.  *See Patriot*

*Cinemas, Inc. v. General Cinemas Corp.*, 834 F.2d 208, 212 (1st Cir. 1987) ("Judicial estoppel

should be employed when . . . intentional self-contradiction is being used as a means of obtaining

unfair advantage in a forum provided for suitors seeking justice.").

    With respect to the third *New Hampshire* factor—unfair advantage—it is clear that

Fannie Mae would derive a considerable benefit from being able to pursue this lawsuit against

KPMG, an advantage it can procure solely by disputing reports that only months ago Fannie Mae

was trumpeting to protect itself.  After repeatedly representing to this Court the accuracy of these

Reports, Fannie Mae should not now be allowed to play "fast and loose" by adopting a contrary

view simply to prevent the dismissal of its own allegations.  Here the advantage Fannie Mae

seeks is manifestly unfair:  to proceed with a lawsuit based on alleged facts that are directly

antithetical to facts Fannie Mae has conceded to be incorrect.  Estoppel principles preclude

Fannie Mae from pursuing such a suit.[7]

## CONCLUSION

This is a straightforward case.  The complaint alone establishes a sufficient basis to

dismiss the action on contributory negligence and *in pari delicto* grounds.  Fannie Mae's

adoption of the Rudman Report, its Congressional testimony, its SEC filings, and its motion for

judicial notice of the OFHEO Reports simply cement that conclusion.  The complaint should be

dismissed.  A proposed order is attached.

Respectfully submitted this 16th day of February 2007.


  /s/ Andrew S. Tulumello
F. Joseph Warin (D.C. Bar No. 235978)
Andrew S. Tulumello (D.C. Bar No. 468351)
Melanie L. Katsur (D.C. Bar No. 484969)
Henry C. Whitaker (D.C. Bar No. 499210)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for Defendant KPMG LLP*

---

[7] Unlike Fannie Mae, KPMG has not "accepted" the "findings" of the Rudman Report; filed statements with the SEC reporting the findings of those reports; nor asserted in this Court that judicial notice should be taken of portions of the OFHEO reports.  KPMG is not advocating that this Court accept the truth of every finding made in all of these reports; rather, KPMG requests that *Fannie Mae* be estopped from denying what *Fannie Mae* has repeatedly admitted about these reports in other forums.

## CERTIFICATE OF SERVICE

I hereby certify that I caused copies of the foregoing to be transmitted on February 16,

2007, to the following counsel registered to receive electronic service:

Jerome L. Epstein
Jenner & Block LLP
601 13th Street, N.W.
Washington, D.C.  20005
*Counsel for Fannie Mae*


 /s/ Justin S. Herring
Justin S. Herring

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FANNIE MAE,

*Plaintiff*,

v.

KPMG LLP,

*Defendant*.

No. 1:06-cv-02111 (RJL)

**[PROPOSED] ORDER GRANTING MOTION OF DEFENDANT KPMG
LLP TO DISMISS FANNIE MAE'S COMPLAINT**

The Motion Of Defendant KPMG LLP To Dismiss Fannie Mae's Complaint is

GRANTED.  It is hereby ORDERED that Fannie Mae's Complaint is DISMISSED with

prejudice.

Dated:

_____
Richard J. Leon, U.S. District Judge

# Exhibit A





**Our Business Is
The American Dream**    Search [        ] [ GO ]  [ Advanced Search ]

[ Contact Us ]  [ FAQ ]  [ Site Map ]  [ Privacy ]  [ Legal ]

**Home**

**Fannie Mae News**

**Media**

News Releases                    ▶

Statements

Executive Speeches

For the Media

National Housing Survey

Economics & Mortgage
Market Analysis

E-News

Webcasts

**Initiatives**

**About Us**

About Fannie Mae

Corporate Governance

Investor Relations

Diversity & Inclusion

Careers

**For Business Partners**

Affordable Housing &
Community Development

Single-Family

Multifamily

Tools & Resources

Debt Securities

Mortgage-Backed Securities

**For Home Buyers &
Homeowners**

Homepath

Find a Mortgage

Find a Lender Search

Fannie Mae-Owned
Property Search

Resources

**PR Contacts**       Chuck Greener        Phone: (202) 752-2616
                                           Cellular:
                                           Pager:
                                           PIN:

                      Brian Faith          Phone: (202) 752-6720
                                           Cellular:
                                           Pager:
                                           PIN:

                      Media Hotline        Phone: 1-888-FAN-NOW4
                                           (1-888-326-6694)

# News Release

February 23, 2006

**Statement by Stephen B. Ashley**

Chairman of the Fannie Mae Board of
Directors

Today, Fannie Mae's Board of Directors is
releasing the entire report of the Paul,
Weiss investigation. The Board asked
former U.S. Senator Warren Rudman and
the law firm of Paul, Weiss, Rifkind,
Wharton & Garrison, LLP, to conduct a
thorough review of the issues raised in the Office of Federal Housing
Enterprise Oversight (OFHEO) special examination report of September
2004, and other matters relating to Fannie Mae's accounting,
governance, structure and internal controls.

The Board gave Paul, Weiss unrestricted authority to take this
investigation wherever it led, and leave no stone unturned. The Paul,
Weiss team sought and received over 4 million documents and
conducted some 240 interviews with company personnel. The team
produced a 616-page report and a 31-page executive summary.

This report speaks for itself. It sets forth the facts and lays out a clear,
detailed picture of what went wrong at Fannie Mae, why it happened,
and what needs fixing.

The report states:

- "The Company, under the Board's direction and OFHEO's input,
  has undergone an extensive transformation in both personnel
  and structure since September 2004."

- "Since [September 2004] … there has been a dramatic shift in
  the 'tone at the top' and the Company's internal organization."

- "[N]o member of management who we found knowingly
  participated in improper conduct continues to be an employee of
  the Company."

- "[Paul, Weiss's] suggestions for changes in corporate governance
  either have been implemented or are underway."

- "With respect to the conduct of the Board prior to September
  2004, we conclude that the Board endeavored to operate in a
  manner consistent with its fiduciary obligations and evolving
  corporate governance standards."

With regard to past accounting practices, the report states:

- "[M]anagement's accounting practices in virtually all of the areas
  that [Paul, Weiss] reviewed were not consistent with [Generally

**Related Links**

Statement by Daniel H.
Mudd

Executive Summary 
(34 Pages)

Full Report With
Appendices
(2,652 Pages)

Accepted Accounting Principles], and, in many instances, management was aware of the departures from GAAP."

- "[E]xcept for one instance in connection with the 1998 financial statements, [Paul, Weiss] did not find evidence supporting the conclusion that management's departures from GAAP were motivated by a desire to maximize bonuses in a given period. [Paul, Weiss] did, however, find evidence amply supporting the conclusion that management's adoption of certain accounting policies and financial reporting procedures was motivated by a desire to show stable earnings growth, achieve forecasted earnings, and avoid income statement volatility."

- "[E]mployees who occupied critical accounting, financial reporting and audit functions at the Company were either unqualified for their positions, did not understand their roles, or failed to carry out their roles properly."

- "[T]he information that management provided to the Board of Directors with respect to accounting, financial reporting, and internal audit issues generally was incomplete and, at times, misleading."

- "The Company's accounting systems were grossly inadequate."

- "[T]he former CFO and … the former Controller, were primarily responsible for adopting or implementing accounting practices that departed from GAAP, and that they put undue emphasis on avoiding earnings volatility and meeting EPS targets and growth expectations. As for the former Chairman and CEO … we did not find that he knew that the Company's accounting practices departed from GAAP in significant ways. We did find, however, that [the former Chairman and CEO] contributed to a culture that improperly stressed stable earnings growth and that, as Chairman and CEO of the Company from 1999 through 2004, he was ultimately responsible for the failures that occurred on his watch."

- "[A]lthough management paid lip service to a culture of openness, intellectual honesty, and transparency, the actual corporate culture suffered from an attitude of arrogance (both internally and externally) and an absence of cross-enterprise teamwork (with a "siloing" of information), and discouraged dissenting views, criticism, and bad news."

These findings are disturbing, disappointing and very serious. But big problems brought to light can teach big lessons. The Board accepts and embraces the report, its findings, and recommendations, including those regarding the company's structure, functions, financial system, compensation, and policies to ensure adherence to proper accounting practices and new internal controls. We acknowledge we have a lot of work to do to restore faith in Fannie Mae, and we are committed to doing that. We will continue to implement the improvements and move the company forward.

Going forward, there are ongoing investigations of Fannie Mae by OFHEO, the SEC, and the Department of Justice (DOJ). The Board has directed the company to submit the Paul, Weiss report to these authorities and has directed Fannie Mae's counsel to actively engage with these authorities as they complete their reviews of Fannie Mae. Once these reviews are complete the Board will determine what further remedial actions may be warranted. The Board does not preclude taking any appropriate action based on the findings in this report and we will be working in close collaboration with our regulators and the appropriate authorities. In addition, should regulatory or law enforcement authorities initiate legal actions, the Board pledges its full cooperation.

Since the OFHEO report of September 2004, Fannie Mae has already undertaken a number of significant changes as a full picture of issues or relevant practices emerged. These changes include:

- Separating the roles of CEO and Chairman
- Hiring a new senior management team, including President and CEO Dan Mudd, as well as new Chief Financial Officer Bob

Blakely, new Controller David Hisey, and new Chief Audit Executive Jean Hinrichs
- Eliminating two management Board positions, retaining only one management position on the Board
- Replacing the company's outside auditor with Deloitte & Touche and directing the new auditor to conduct a comprehensive re-audit of the company's processes, controls, and accounting policies and methodologies
- Completely reorganizing the Finance function, including the appointment of a new Controller, a new Chief of Accounting Policy, and eight other new officers and the separation of the Controller's office and the Portfolio business from the CFO function, with the head of the Portfolio business no longer reporting to the CFO
- Reorganizing and strengthening the Internal Audit function, led by a new Chief Audit Executive with a direct line of reporting to the Board's Audit Committee
- Establishing an ongoing Compliance Committee of the Board, led by Patrick Swygert, charged with ensuring Fannie Mae's fulfillment of all legal and regulatory obligations, including the company's agreements with its safety and soundness regulator, OFHEO
- Establishing a new and separate Compliance, Ethics and Investigations function, led by new Chief Compliance Officer Bill Senhauser, reporting to the CEO and the Board's Compliance Committee
- Reorganizing the Risk function through the restructuring of the Risk Policy and Capital Committee of the Board and the establishment of a new Chief Risk Officer position
- Reorganizing and decentralizing the company's Law and Policy division so that each function -- Communications, Government and Industry Relations, and Legal, including the new General Counsel -- reports directly and separately to the CEO
- Establishing regular interactions between the Chairman and other members of the Board and OFHEO; weekly meetings and status reporting between management and OFHEO
- Adopting a new executive compensation structure with broader performance goals
- Fulfilling the OFHEO-approved capital restoration plan, including meeting the regulator's requirement of a 30 percent capital surplus.

These actions represent a beginning, not an end, to addressing Fannie Mae's issues. The Board and the company have more work to do. The changes to both senior management and the Board, including the addition of new Board members John Wulff, Greg Smith, and Bridget Macaskill, will enhance our efforts.

This is a tough day for Fannie Mae. Today's report -- and the upcoming final report of OFHEO on its special examination of the company -- will be our roadmap for moving forward and becoming a better company for its shareholders, stakeholders, partners and the housing finance system.

*Fannie Mae is a New York Stock Exchange Company. It operates pursuant to a federal charter. Fannie Mae has pledged through its American Dream Commitment to expand access to homeownership for millions of first-time home buyers; help raise the minority homeownership rate to 55 percent; make homeownership and rental housing a success for millions of families at risk of losing their homes; and expand the supply of affordable housing where it is needed most.*

**Fannie Mae Resource Center**        Telephone 1-800-7FANNIE
                                        (1-800-732-6643)

# Exhibit B

Case 1:06-cv-02111-RJL    Document 10-3    Filed 02/16/2007    Page 6 of 11





**Our Business Is
The American Dream**

Search [          ] GO   Advanced Search

Contact Us    FAQ    Site Map    Privacy    Legal

Home

**Fannie Mae News**

Media

News Releases
Statements
Executive Speeches
For the Media
National Housing Survey
Economics & Mortgage
Market Analysis
E-News
Webcasts
Initiatives

**About Us**

About Fannie Mae
Corporate Governance
Investor Relations
Diversity & Inclusion
Careers

**For Business Partners**

Affordable Housing &
Community Development
Single-Family
Multifamily
Tools & Resources
Debt Securities
Mortgage-Backed Securities

**For Home Buyers &
Homeowners**

Homepath
Find a Mortgage
Find a Lender Search
Fannie Mae-Owned
Property Search
Resources

| PR Contacts | Chuck Greener | Phone: (202) 752-2616 Cellular: Pager: PIN: |
| | Brian Faith | Phone: (202) 752-6720 Cellular: Pager: PIN: |
| | Media Hotline | Phone: 1-888-FAN-NOW4 (1-888-326-6694) |

# News Release

February 23, 2006

**Statement by Daniel H. Mudd**

President and CEO, Fannie Mae

The Paul, Weiss report is strong but good medicine. We will work closely with the Fannie Mae Board of Directors, the Office of Federal Housing Enterprise Oversight (OFHEO), the U.S. Securities and Exchange Commission (SEC), and others as we continue to move forward with remedial measures, carry out the terms of our regulatory agreements with OFHEO, make progress toward completing our restatements, cooperate with federal investigators and regulators, and build a better company. We have to get things right, get back on track, and continue serving the nation's housing needs.

Fannie Mae is a different company than a year ago. We have been humbled, even embarrassed. But we have begun to make significant changes. We have put in place a new management team, with a new Chief Financial Officer, Controller, and Chief Audit Executive. We are building new Chief Compliance Officer and Chief Risk Officer functions. We have reorganized our legal and regulatory functions, added a new General Counsel, and eliminated the combined Law and Policy division. We have recapitalized Fannie Mae, building a 30 percent capital surplus under our agreement with OFHEO. We have adopted a new, more cooperative, constructive and professional approach to working with our regulators, Congress and policymakers. In addition, splitting the roles of CEO and Chairman of the Board and increasing the breadth and depth of management and Board interaction have given Fannie Mae a new corporate governance structure and dynamic.

While our accounting is under continuous review in the restatement process and is the subject of ongoing discussions with our regulator, the Paul, Weiss report concludes that the principal problematic accounting issues addressed in the report have already been disclosed. Based on our review of the report, there was one issue that had not been addressed previously in our capital submissions to OFHEO. That issue is the "Minority Lending Initiative" (identified as Item II C. 14 in the Executive Summary of the report) and relates to a $35.5 million payment in 2003. While the transaction is currently being assessed, our estimate of the potential impact is that it will not be material. We believe our capital level is sufficient to absorb the financial impact of accounting issues identified in the report.

On that note, we are engaged in our financial restatement and are building new systems and processes to restate prior years of financial results to ensure full compliance with Generally Accepted Accounting Principles. The company expects the restatement effort to result in additional matters being identified that are not addressed in this report.

**Related Links**

Statement by Stephen B. Ashley

Executive Summary (34 Pages)

Full Report With Appendices (2,652 Pages)

However, we are building a new organization for finance, accounting and controls, with new officers, a new external auditor, greater accountability and operational discipline, and stronger checks and balances. We are striving to rebuild market confidence on a foundation of openness, transparency, and clarity. And in the past year, Fannie Mae has begun to adopt an attitude and approach built on lessons learned and consistent with our role in the secondary market and public purpose to help the housing finance system to expand affordable housing.

Despite the changes and progress we have begun to make, we also recognize that we have much, much more to do. As we learn the lessons and adopt the recommendations provided by the report, we will continue to work diligently to complete our restatement and return to a track of issuing timely financial statements.

Finally, the report confirms that many of our problems were rooted in our corporate culture. So as we continue to make change and progress, we are striving to build a new culture at Fannie Mae. The company we want to become is one that emphasizes **service** to customers, partners, shareholders, stakeholders and the market; **engagement** with stakeholders that is open, honest, cooperative and modest; **accountability** to regulators, Congress, those we serve and the public; and **management** that earns the trust of regulators, the market and those we serve that Fannie Mae is a well-run company. We made change and progress this year by listening and learning; we want a culture that listens and learns every day.

Our challenge is to build the company we want to become, one that is worthy of our public purpose -- to serve affordable housing. In doing so, I believe the strong fundamentals of the mortgage finance market, the central role and competitive position of Fannie Mae, and the team we have built over the course of the past year promise a better future.

*Fannie Mae is a New York Stock Exchange Company. It operates pursuant to a federal charter. Fannie Mae has pledged through its American Dream Commitment to expand access to homeownership for millions of first-time home buyers; help raise the minority homeownership rate to 55 percent; make homeownership and rental housing a success for millions of families at risk of losing their homes; and expand the supply of affordable housing where it is needed most.*

**Fannie Mae Resource Center**       Telephone 1-800-7FANNIE
                                                (1-800-732-6643)

©1998-2007 Fannie Mae       Contact Us    FAQ    Site Map    Advanced Search    Privacy    Legal

# Exhibit C



**Opening Statement Prepared for Delivery by**
**Daniel H. Mudd**
**President and CEO, Fannie Mae**

**U.S. Senate Committee on Banking, Housing and Urban Affairs**
**Washington, DC**
**June 15, 2006**

Mr. Chairman, Senator Sarbanes and members of the Committee. My name is Daniel H. Mudd, and I appreciate the opportunity to appear before you today to update you on the progress we have made at Fannie Mae, where I have served as Chief Executive Officer since December 2004.

The final OFHEO report, and the special investigation by former Senator Warren Rudman and the law firm of Paul, Weiss for our Board of Directors, have provided a detailed picture of the failings at Fannie Mae during the years 1998 through 2004.

I appreciate the opportunity to comment on that period, and I would like to report on what we have done to overhaul the company since the start of 2005, and also respond to your questions.

It is clear from the reports that Fannie Mae got a lot of things wrong from 1998 to 2004. Bad decisions about accounting and many other matters let a lot of people down, and in doing so, broke a public trust. We have learned some painful lessons about getting things right, and about hubris and humility.

We have made changes. We are making progress. And we have much more to do. I am determined to do it.

We began with a plan to fix the company on December 21, 2004, the day I was appointed as Fannie Mae's interim CEO. We set out to: Restore our capital. Restate our prior financial statements. Rebuild relationships with our regulators, partners, stakeholders and Congress. Manage our business. Re-center the company on serving families who need affordable housing. Armor-plate our financial controls. And finally, fix our corporate culture, which the OFHEO report makes clear led to a lot of our problems.

I have heard your comments today, and I have heard many more in private. The days of arrogant, defiant, "my way" Fannie Mae had to end. We have begun to build a Fannie Mae that listens better, welcomes accountability, works with our regulators and with Congress, and serves the market by putting our mission to serve housing first.

Let me describe some of the tangible steps we're taking, starting with the people.

*First*, we have established a new senior management team to provide the leadership, talent and ethical standards worthy of our role and mission.

Of the 55 members of the company's senior-most management, 75 percent are new or in different positions and a third are entirely new to the company, especially in the critical finance, accounting and risk areas.

We have a new Chief Financial Officer. We have a new Controller. A new Chief Audit Executive. A new Chief of Accounting Policy. We have a new General Counsel, a new Chief Risk Officer, and a new head of Corporate Strategy. These leaders join us from important roles in major financial institutions, large corporations, and highly regarded firms.

*Second*, in cooperation and consultation with OFHEO, we are fundamentally reorganizing the company to ensure that strong checks and balances are in place. For example:

- To ensure appropriate segregation of duties, we have separated the portfolio business from the CFO's responsibilities.
- Under the new CFO, we have reorganized the Finance function and brought in entirely new leadership from outside the company.
- We are reorganizing and strengthening Internal Audit, and the new Chief Audit Executive has a direct and independent line to the Board's Audit Committee.

We have also replaced our outside auditor with Deloitte & Touche, which is conducting a comprehensive re-audit of the entire company. Deloitte, which formerly provided advice to OFHEO when several of the accounting problems were first identified, has over 300 auditors on site at Fannie Mae.

We are making further key organizational changes, which include:

- Establishing a new and separate Compliance and Ethics Organization to provide a robust compliance and internal investigation function, led by a senior executive, with a reporting line to the Board. We have written and pledged ourselves to a standard of ethical, honest and transparent conduct inside and outside the company.
- Establishing a new Risk Organization with an independent and comprehensive view of all the risks the company is taking, and again, with a reporting line to the Board. We have recruited and hired a senior executive from JP Morgan Chase to lead this function.
- Disbanding the so-called Law and Policy division so that each function reports directly and separately to me. These are staff functions that exist to support our business and our mission -- not a center of command and control.

*Third*, we have restored and maintained our capital adequacy, including the 30-percent surplus mandated in our agreement with OFHEO and supervised by their examiners. We now have roughly $39 billion dollars of capital in reserve; our ratio of capital to assets is higher than it has ever been in our history.

*Fourth*, we are paying people to do the job -- not to hit targets. We have adopted a new executive compensation structure with broad performance goals that include achieving affordable housing mission goals, improving our culture, complying with regulatory standards, and delivering shareholder value.

*Fifth*, we are making steady progress on completing our financial restatement, which will be done by the end of 2006.

We have put over 1,000 full-time and 2,500 contract employees on the job and invested over $800 million, a large part of that on new systems. We have completed an exhaustive review of our accounting policies and practices to determine their consistency with Generally Accepted Accounting Principles.

We have completed the restatement of several, significant portions of our balance sheet, and developed systems to support and control our business. We are in the process of putting in place systems and controls to ensure we are GAAP and Sarbanes-Oxley compliant. There is absolutely no routine, process or control anywhere in the company that is beyond the scope of overhaul and improvement to the highest standard. We have over 150 projects underway and 200 associates working on this alone. We can get this done -- our overarching goal is to get it done *right* the first time, and to make the investments to ensure this never happens again.

\* \* \*

Mr. Chairman, I would like to reiterate a commitment I made in my testimony last April, that Fannie Mae will work cooperatively to support the efforts of Congress to pass legislation to strengthen GSE regulation.

In particular, we continue to support legislation to create a strong, well-funded regulator that would oversee both the safety and soundness and the housing mission of the enterprises.

We believe the regulator should have bank-like regulatory powers, including the authority to reduce on-balance sheet activities, based on safety and soundness. We also support housing goals, and an affordable housing fund, that strengthen our affordable housing mission and our role in the U.S. housing economy.

With respect to how we engage with Congress -- that is part of the new Fannie Mae as well. I hope you have seen a new tone and manner of quiet, fact-based engagement from us. Where we disagree, we do so respectfully. You have my pledge to do all we can to help move this process forward.

Mr. Chairman, from the day I was appointed to lead Fannie Mae, we have been moving forward aggressively to fix the problems OFHEO has cited. The question may be, why is this worth doing? The reason this company exists is because of our housing and liquidity mission to help put people into homes.

Indeed, in these past 18 months:

- We have purchased or guaranteed more than four million home loans.
- We helped to create 136,000 more minority homeowners and serve 600,000 low- and moderate-income families overall.
- We helped provide financing to build, rehab or refinance 600,000 units of affordable rental housing.
- Nearly two-thirds of our overall business serves one or more of our HUD affordable housing goals.
- We are investing literally billions of dollars in the Gulf Coast region to help finance and rebuild homes and communities there.
- We attracted more than $21 billion of overseas investment to provide liquidity to the U.S. housing finance market.
- Most important, we are providing what we estimate is roughly half a trillion dollars this year to finance homes for three million Americans, 25 percent of them African American, Hispanic and/or first-time home buyers.

I know that you are counting on us to fulfill our mission, and help to serve this growing nation and its growing housing needs.

That is what makes this worth doing.

Mr. Chairman, this company is changing and will continue to change thanks to the lessons we have been given to learn. My obligation and pledge to you, the Congress, and the market we serve is to get this right and move forward. We are building a new Fannie Mae that is able to truly serve affordable housing in America.

I thank you for the opportunity to appear before you today. I look forward to your questions.

©1998-2006 Fannie Mae
Find this page at: http://www.fanniemae.com/media/speeches/speech.jhtml?
repID=/media/speeches/2006/speech_261.xml&counter=1&p=Media&s=Executive+Speeches