**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FANNIE MAE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    NO. 1:06CV02111 (RJL) |
| | ) |
| KPMG LLP, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF FANNIE MAE'S OPPOSITION
TO KPMG'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................................1

ARGUMENT ................................................................................................................................5

   I.   THE ALLEGATIONS IN THE COMPLAINT STATE A CLAIM OF
PROFESSIONAL MALPRACTICE. ..................................................................................5

      A.  The Complaint Details KPMG's Professional Malpractice...........................................5

      B.  The Elements Of A Prima Facie Claim For Professional Malpractice Are
Satisfied.......................................................................................................................8

   II.  KPMG'S AFFIRMATIVE DEFENSE OF CONTRIBUTORY NEGLIGENCE
DOES NOT JUSTIFY DISMISSAL OF THE COMPLAINT. .........................................11

      A.  An Auditor Cannot Escape Liability For Its Own Malpractice By Relying On
The Very Accounting Errors That The Auditor Was Hired To Detect And
Remedy. .....................................................................................................................11

      B.  District of Columbia Courts Would Follow *National Surety*. ....................................16

      C.  Contributory Negligence Is A Question Of Fact That Cannot Be Resolved At
The Rule 12(b)(6) Stage..............................................................................................19

  III.  KPMG'S AFFIRMATIVE DEFENSE OF *IN PARI DELICTO* DOES NOT
JUSTIFY DISMISSAL OF THE COMPLAINT...............................................................21

      A.  The *In Pari Delicto* Doctrine Requires Fraud Rather Than Negligence, And
Fraud Is Not Alleged In The Complaint. .....................................................................21

      B.  An Auditor Cannot Escape Liability For Its Own Malpractice By Relying On
A Purported Fraud That The Auditor Was Hired To Detect And Remedy. ................23

      C.  *In Pari Delicto* Is A Question Of Fact That Cannot Be Resolved At The Rule
12(b)(6) Stage. ...........................................................................................................31

  IV.  KPMG'S INVOCATION OF "JUDICIAL ESTOPPEL" IS WITHOUT MERIT............31

      A.  Judicial Estoppel Is A Doctrine Of Limited Scope.....................................................32

      B.  Judicial Estoppel Does Not Apply To Any Of The Materials Cited By KPMG. .........33

         1.  Judicial Estoppel Does Not Apply To Documents That Never Were
Offered In Court.................................................................................................34

2.   Judicial Estoppel Does Not Apply To The OFHEO Reports. ...............................37

CONCLUSION.............................................................................................................................41

# TABLE OF AUTHORITIES

## CASES

*1000 Friends of Maryland v. Browner*, 265 F.3d 216 (4th Cir. 2001) .........................................32

*Aetna Casualty & Surety Co. v. Carter*, 549 A.2d 1117 (D.C. 1988) ..........................................19

*Allen v. Zurich Insurance Co.*, 667 F.2d 1162 (4th Cir. 1982)....................................................35

*In re Ark-La-Tex Timber Co.*, No. 06-30105, __F.3d__, 2007 WL 766208 (5th Cir. Mar. 15, 2007) ................................................................................................................................38

*Baena v. KPMG LLP*, 453 F.3d 1 (1st Cir. 2006)........................................................................27

*Board of Trustees of Community College District No. 508 v. Coopers & Lybrand*, 803 N.E.2d 460 (Ill. 2003) ...........................................................................................15, 17, 18

*Cenco, Inc. v. Seidman & Seidman,*, 686 F.2d 449 (7th Cir. 1982)..................................22, 28, 29

*In re Cendant Corp. Securities Litigation*, 139 F. Supp. 2d 585 (D.N.J. 2001) ...........................27

*Cereal Byproducts Co. v. Hall*, 132 N.E.2d 27 (Ill. App. Ct. 1956)............................................17

*Comeau v. Rupp*, 810 F. Supp. 1172 (D. Kan. 1992) ...........................................14, 15, 17, 18, 25

*Conley v. Gibson*, 355 U.S. 41 (1957) ..........................................................................................8

*Cumis Insurance Society, Inc. v. Tooke*, 739 N.Y.S.2d 489 (App. Div. 2002)..............................18

*Currier v. Postmaster General*, 304 F.3d 87 (D.C. Cir. 2002)....................................................31

*Curtis Packaging Corp. v. KPMG, LLP*, No. X06CV990156558S, 2002 WL 31015828 (Conn. Super. Ct. July 31, 2002) ......................................................................................16

*District of Columbia v. Hampton*, 666 A.2d 30 (D.C. 1995)........................................................20

*In re Dublin Securities, Inc.*, 133 F.3d 377 (6th Cir. 1997)........................................................27

*Durphy v. Kaiser Foundation Health Plan of Mid-Atlantic States, Inc.*, 698 A.2d 459 (D.C. 1997) ......................................................................................................................17

*EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621 (D.C. Cir. 1997)...........................39

*Edwards v. Aetna Life Insurance Co.*, 690 F.2d 595 (6th Cir. 1982) ...........................................35

*Ellis v. James V. Hurson Associates, Inc.*, 565 A.2d 615 (D.C. 1989) ..........................................18

*Eubanks v. CBSK Financial Group, Inc.*, 385 F.3d 894 (6th Cir. 2004) ................................32, 33

*FDIC v. Ernst & Young*, 967 F.2d 166 (5th Cir. 1992) ...................................................................27

*Fields v. Hunter*, 368 A.2d 1156 (D.C. 1977) .............................................................................30

*Fullmer v. Wohlfeiler & Beck*, 905 F.2d 1394 (10th Cir. 1990) ...............................................14, 17

*Grant Thornton, LLP v. FDIC*, No. 1:00-0655 (S.D. W. Va. Mar. 14, 2007) ..............................17

*In re Greater Southeast Community Hospital Corp. I*, 353 B.R. 324 (Bankr. D. Colo. 2006) ............................................................................................................................27, 28

*Hall v. Carter*, 825 A.2d 954 (D.C. 2003) ....................................................................................17

*Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344 (7th Cir. 1995) ...............................36

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) .............................................27, 28

*Holland v. Arthur Andersen & Co.*, 469 N.E.2d 419 (Ill. App. Ct. 1984) ....................................21

*Howard v. Gutierrez*, Civ. A. No. 05-1968, __F. Supp. 2d__, 2007 WL 404352 (D.D.C. Feb. 6, 2007) ...............................................................................................................................33

*Insolia v. Philip Morris Inc.*, 216 F.3d 596 (7th Cir. 2000) ...........................................................34

*In re Integrity Insurance Co.*, 573 A.2d 928 (N.J. Super. Ct. App. Div. 1990) ...........................24

*Jeffries v. Potomac Development Corp.*, 822 F.2d 87 (D.C. Cir. 1987) .......................................19

*Jewelcor Jewelers & Distributors, Inc. v. Correctional*, 542 A.2d 72 (Pa. Super. Ct. 1988) ...............................................................................................................................15, 17

*Johnson v. Lindon City Corp.*, 405 F.3d 1065 (10th Cir. 2005) ...................................................32

*Jones v. Rogers Memorial Hospital*, 442 F.2d 773 (D.C. Cir 1971) .............................................19

*Keller v. United States*, 58 F.3d 1194 (7th Cir. 1995) ...................................................................36

*King v. Herbert J. Thomas Memorial Hospital*, 159 F.3d 192 (4th Cir. 1998) .............................35

*Konstantinidis v. Chen*, 626 F.2d 933 (D.C. Cir. 1980) ................................................................35

*Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820 (8th Cir. 2003) .............................................38

*Lewis v. Realty Equities Corp. of New York*, 396 F. Supp. 1026 (S.D.N.Y. 1975) ......................36

*Lincoln Grain, Inc. v. Coopers & Lybrand*, 345 N.W.2d 300 (Neb. 1984)............................15, 17

*Lynn v. District of Columbia*, 734 A.2d 168 (D.C. 1999).................................................19

*Maalouf v. Swiss Confederation*, 208 F. Supp. 2d 31 (D.D.C. 2002)..........................................19

*Musler v. Georgeff*, 233 F. Supp. 2d 727 (D. Md. 2002), *aff'd*, 212 F.R.D. 287 (D. Md. 2003) .................................................................................................35

*NCP Litigation Trust v. KPMG LLP*, 901 A.2d 871 (N.J. 2006)...................................24

*National Surety Corp. v. Lybrand*, 9 N.Y.S.2d 554 (App. Div. 1939) .........................3, 12, 13, 25

*New Hampshire v. Maine*, 532 U.S. 742 (2001)...................................................32, 33, 34

*Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147 (2d Cir. 2003), *aff'g*, 80 F. Supp. 2d 129 (S.D.N.Y. 1999)...............27, 28

*Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145 (11th Cir. 2006), *cert. denied*, 127 S. Ct. 45 (2006)...................................................27, 28

*Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001) ...............................................................................................27, 28

*Official Committee of Unsecured Creditors of Allegheny Health, Education and Research Foundation v. PricewaterhouseCoopers*, No. 2:00cv684, 2007 WL 141059 (W.D. Pa. Jan. 17, 2007)..................................................................................27

*Paraskevaides v. Four Seasons Washington*, 292 F.3d 886 (D.C. Cir. 2002)...............................19

*Piedmont Resolution, LLC v. Johnston, Rivlin & Foley*, 999 F. Supp. 34 (D.D.C. 1998) ............36

*Plan Committee v. PricewaterhouseCoopers, LLP*, 335 B.R. 234 (D.D.C. 2005)..........................8

*Quadrangle Development Corp. v. Otis Elevator Corp.*, 748 A.2d 432 (D.C. 2000) ..................30

*SEC v. Happ*, 392 F.3d 12 (1st Cir. 2004) ....................................................................32

*Sanders v. District of Columbia*, No. Civ. A. 97-2938 (PLF), 2002 WL 648965 (D.D.C. Apr. 15, 2002)...........................................................................................33

*Shapiro v. Glekel*, 380 F. Supp. 1053 (S.D.N.Y. 1974)..........................................15, 17

*Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) ....................................27

*Siegel v. Mazda Motor Corp.*, 835 F.2d 1475 (D.C. Cir. 1987) ....................................................16

*Smith v. United States*, 277 F. Supp. 2d 100 (D.D.C. 2003)........................................................33

*Steiner Corp. v. Johnson & Higgins of California*, 135 F.3d 684 (10th Cir. 1998) .....................18

*Stella v. Graham-Paige Motors Corp.*, 259 F.2d 476 (2d Cir. 1958)............................................35

*Stroud v. Arthur Andersen & Co.*, 37 P.3d 783 (Okla. 2001).................................................15, 17

*Targus Group International, Inc. v. KPMG LLP*, No. 03CC2302 (Cal. Super. Ct. Jan. 30, 2003) ........................................................................................................................24

*Travel All Over The World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423 (7th Cir. 1996) ...................................................................................................................36, 37

*United Mine Workers of America 1974 Pension v. Pittston Co.*, 984 F.2d 469 (D.C. Cir. 1993) ...................................................................................................................32, 33

*Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138 (2d Cir. 2005)...................................................32

*Wager v. Pro*, 575 F.2d 882 (D.C. Cir. 1976).............................................................................28

*Washington Gaslight Co. v. District of Columbia*, 161 U.S. 316 (1896) .....................................22

*Weakley v. Burnham Corp.*, 871 A.2d 1167 (D.C. 2005) .............................................................18

*Wegad v. Howard Street Jewelers, Inc.*, 605 A.2d 123 (Md. 1991)............................................17

## STATUTES

15 U.S.C. § 78j-1(a)(1) ..................................................................................................................26

15 U.S.C. § 78j-1(b)(3) ..................................................................................................................26

15 U.S.C. § 78j-1(b)(4) ..................................................................................................................26

15 U.S.C. § 78j-1(m)(2) .................................................................................................................29

15 U.S.C. § 78m(b) ..........................................................................................................................5

Fed. R. Civ. P. 12 ...........................................................................................................................31

Fed. R. Evid. 201 ...........................................................................................................................38

AU § 110.02 ......................................................................................................12, 26

AU § 316 *et seq.*.....................................................................................................26

## MISCELLANEOUS

30B Michael H. Graham, *Federal Practice and Procedure* (3d ed. 2004) ...................................36

KPMG, *Basic Principles for Audit Committees* (2002).................................................................29

*Observations on Auditors' Implementation of PCAOB Standards Relating to Auditors' Responsibilities with Respect to Fraud*, PCAOB Release No. 2007-001 (Jan. 22, 2007) ...........................................................................................................26

2001 OFHEO Report to Congress ......................................................................... 37-38

2002 OFHEO Report to Congress ...............................................................................38

2004 OFHEO Report of Special Examination of Fannie Mae ....................................38

2006 OFHEO Report .....................................................................................................40

*Restatement (Third) of Agency* (2006).........................................................3, 16, 24, 25

*Restatement (Third) of Torts*, Apportionment of Liability (2000).........................15, 16

Statement Of OFHEO Director James B. Lockhart On Fannie Mae Lawsuit Against KPMG (Dec. 12, 2006), *available at* http://www.ofheo.gov/News.asp?FormMode= Releases&ID =329 ..............................................................................................4

5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* (3d ed. 2004) ...........................................................................................................19

18B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* (2d ed. 2002) ...........................................................................................................34

21B Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* (2d ed. 2005) ..............................................................................................39

## INTRODUCTION AND SUMMARY OF ARGUMENT

The entire premise of KPMG's motion to dismiss — that an auditor can escape liability for its own malpractice by blaming its client for the very accounting errors that the auditor was hired to detect and remedy — is flawed. According to KPMG, it does not matter that, as KPMG's engagement letters expressly state, KPMG was hired for the specific purpose of ensuring that Fannie Mae's financial statements were "free of material misstatement, whether caused by error or fraud." Nor does it matter that those financial statements, which KPMG expressly certified as complying with Generally Accepted Accounting Principles ("GAAP"), in fact were full of GAAP errors — errors that prompted one of the largest accounting restatements in history. Nor does it matter that KPMG consistently violated standards of care in the audit profession and was wrong in applying GAAP not just in one or two instances, but rather for more than *thirty different* accounting issues involving thousands of transactions. In short, under KPMG's theory, it does not matter that KPMG's malpractice was rampant.

All that matters, in KPMG's view, is that the errors that KPMG failed to find and remedy were *management's* errors in the first instance. KPMG contends that no matter how negligent it was in failing to detect and correct those errors, the affirmative defenses of contributory negligence and *in pari delicto* absolve KPMG from any responsibility for its own malpractice because management erred in the first place. In KPMG's words, "[a]n allegation that the client's conduct . . . caused an error that the professional failed to catch is *precisely* the kind of claim that the contributory negligence and *in pari delicto* doctrines bar." (KPMG Br. 14, emphasis in original.)

KPMG's invocation of those two affirmative defenses at this stage of the proceedings is entirely misguided. This is a motion to dismiss, where the Court must take as true all of the allegations in the Complaint. The Complaint plainly states a claim for professional malpractice

against KPMG, alleging that KPMG was negligent in certifying the financial statements that Fannie Mae was required to restate, that KPMG improperly planned and executed its audits, in violation of multiple professional audit standards, and that Fannie Mae suffered massive harm as a result. That is more than sufficient.

Nor can the affirmative defenses that KPMG invokes justify a different result. Both contributory negligence and *in pari delicto* involve fact-intensive inquiries, and thus they are particularly ill-suited for resolution on a motion to dismiss. The handful of cases KPMG cites resolving issues concerning *in pari delicto* at the motion to dismiss stage all involve cases in which the Complaint itself alleged fraud on the part of the plaintiff. Here, in contrast, Fannie Mae's Complaint does not allege — indeed, the Complaint affirmatively refutes — any fraud or negligence on Fannie Mae's part. At this stage of the proceedings, this Court need go no further. The motion to dismiss must be denied. *See* Part I below.

But even if KPMG's defenses were presented at summary judgment or trial, KPMG's core theory — that an auditor can insulate itself from liability for its own negligence by relying on the existence of the very accounting errors that it was hired to detect — is wrong. If KPMG's theory were correct, there would be no such thing as a malpractice action against auditors. In all companies, management in the first instance makes the accounting decisions underlying the company's financial statements and supervises their implementation. The central reason why a company's Audit Committee hires independent, outside auditors such as KPMG is to perform a *check* on whether management's accounting decisions comport with GAAP and have been implemented correctly. If KPMG's theory were correct, KPMG would have invented the perfect business model. KPMG could hold itself out as an expert auditor for financial institutions such as Fannie Mae, collect millions of dollars of audit fees, and then walk away no matter how badly

KPMG performed, no matter how clear its errors, and no matter how substantial the wreckage left in its wake.  No professional-services business enjoys such absolute immunity.

KPMG's theory not only defies common sense, it defies common law.  Ever since the seminal case of *National Surety Corp. v. Lybrand*, 9 N.Y.S.2d 554 (App. Div. 1939), courts have rejected KPMG's view.  Given that auditors are hired for the express purpose of detecting management errors, auditors cannot be "immune from the consequences of their negligence because those who employ them have conducted their own business negligently."  *Id.* at 563.

That same principle is reflected in the Restatement of Agency, which states unequivocally that an auditor hired to assess the adequacy of management's financial reporting and controls cannot use even management's purported knowledge of those inadequacies to escape malpractice liability:

> [A] principal may retain a service provider to assess the accuracy of its financial reporting or the adequacy of its internal financial controls . . . .  *If the service provider fails to detect or report deficiencies, the principal's claim against the service provider should not be defeated by imputing to the principal its agents' knowledge of deficiencies in the processes under scrutiny.*

*Restatement (Third) of Agency* § 5.03 cmt. b, at 361 (2006) (emphasis added).  Moreover, even if auditors enjoyed immunity from liability whenever management erred in the application of accounting principles or policies — which is not the law — contributory negligence virtually always is a *question of fact* that cannot be resolved at the Rule 12(b)(6) stage.  *See* Part II below.

KPMG's affirmative defense based on *in pari delicto* fails for the same reasons, plus another one:  the doctrine requires more than negligence or mere error on the part of the plaintiff; the doctrine requires outright fraud, and none is alleged in the Complaint here.  In addition, as with contributory negligence, an auditor cannot defend its failure to perform a competent audit by relying on the alleged fraud that its incompetent audit failed to detect.  That is all the more so

when, as here, the company has a functioning, independent Audit Committee to which the auditor is supposed to report and which stands ready to stop any fraud. And again, none of this can be decided on a motion to dismiss in any event, given that the Complaint's allegations contradict any notion of fraudulent conduct by management, much less by the Audit Committee. *See* Part III below.

Finally, KPMG's judicial estoppel argument is wholly without merit. Courts in this Circuit consistently have cautioned that judicial estoppel distorts the search for the truth. That is why KPMG does not cite any decision by a court in this Circuit that ever has accepted a judicial estoppel argument. Even in jurisdictions that are more receptive to the theory, the doctrine does not apply to extrinsic documents never offered to a court or adjudicative body. KPMG's effort to expand the factual record beyond the four corners of the Complaint is thus to no avail.

Moreover, although irrelevant at this stage of the proceedings, the extrinsic statements of both Fannie Mae and its regulator, OFHEO, support the allegations of malpractice against KPMG. That is why, for example, OFHEO itself sees no inconsistency between its findings and Fannie Mae's claims of negligence here. Indeed, immediately after Fannie Mae filed this lawsuit, OFHEO issued a public statement declaring that the Complaint's allegations were "appropriate and consistent" with OFHEO's findings against KPMG:

> Fannie Mae's filing today of a complaint against KPMG alleging malpractice, breach of contract and negligence for its failures in providing advice and services to the Enterprise and for its role in contributing to billions of dollars in direct damages and other harm to the Enterprise is *appropriate and consistent with the findings of OFHEO's Special Examination reports*.[1]

---

[1] Statement Of OFHEO Director James B. Lockhart On Fannie Mae Lawsuit Against KPMG (Dec. 12, 2006), *available at* http://www.ofheo.gov/News.asp?FormMode=Releases&ID=329 (emphasis added). To the extent that KPMG seeks to introduce any specific statements contained in the OFHEO reports at some later stage, Fannie Mae will address those statements at that time in the contxt of the full factual record.

*See infra* Part IV.

At bottom, this is a straightforward negligence action for KPMG's professional malpractice, and KPMG recognized as much in its own prior filings to this Court. In an effort to defeat a securities fraud complaint filed against it, KPMG told this Court that any claims "that KPMG did not exercise the appropriate duty of care; that its audits were fundamentally flawed; and that its practices did not reflect the exercise of ordinary diligence" present "*classic claims of negligence*." (KPMG 5/15/06 Mem. at 24, No. 06-139, Dkt. 51-1 (emphasis added)) Now, KPMG wants to change course and argue that this negligence action, which makes those precise claims, cannot proceed to a determination on the merits. KPMG's shift is especially ironic given that this Court rejected KPMG's arguments that the securities fraud action against KPMG should be dismissed. Given that the *fraud* claims against KPMG have survived, despite the heightened pleading standards applicable to those claims, the *negligence* claims presented here are all the more viable. KPMG's motion to dismiss should be denied.

## ARGUMENT

## I.    THE ALLEGATIONS IN THE COMPLAINT STATE A CLAIM OF PROFESSIONAL MALPRACTICE.

### A.    The Complaint Details KPMG's Professional Malpractice.

There is no dispute that Fannie Mae's Complaint alleges a prima facie claim of professional malpractice against KPMG. The Complaint alleges that the SEC (the ultimate arbiter of GAAP, *see, e.g.,* 15 U.S.C. § 78m(b)) has ordered Fannie Mae to restate several years of financial statements because of GAAP violations, compelling one of the largest corporate restatements in history. Compl. ¶ 68. That fact alone strongly suggests accounting malpractice, given that those financial statements are the very ones that KPMG incorrectly certified as

complying with GAAP. But Fannie Mae's Complaint goes beyond the restatement, detailing numerous violations of professional standards by KPMG.

The facts set forth in the Complaint, which must be taken as true on this motion to dismiss, present a very different story from that described in KPMG's brief. The Complaint alleges that throughout the relevant period, Fannie Mae's Audit Committee hired KPMG to analyze management's accounting decisions. Specifically, KPMG was hired to scrutinize Fannie Mae's accounting policies, conduct annual audits, and address specific accounting issues raised by the Audit Committee. Compl. ¶ 2. Fannie Mae paid KPMG millions of dollars for those services. *Id.*

Year after year, KPMG told the Audit Committee that all was well. *Id.* ¶ 3. KPMG repeatedly informed the Audit Committee that KPMG had completed careful audits of Fannie Mae's financial records and accounting practices, that KPMG had analyzed not only Fannie Mae's financial reports but also the "quality" of the accounting principles used, that KPMG had reviewed all significant estimates made by management, and that KPMG had identified and closely scrutinized the "significant" and "key" accounting policies and practices. *Id.* ¶¶ 3-4.

The Audit Committee reasonably believed that KPMG was well-positioned to undertake those analyses. In addition to KPMG's self-proclaimed status as a world leader in financial services accounting, KPMG had been Fannie Mae's auditor for more than thirty years. *Id.* ¶ 19. Thus, KPMG was intimately familiar with Fannie Mae's accounting policies, day-to-day practices, and personnel. *Id.* ¶ 43. KPMG accountants frequently were at Fannie Mae's offices, and they had the opportunity to observe, review, and test Fannie Mae's business, accounting, and reporting practices, as well as Fannie Mae's internal controls. *Id.* ¶ 43. KPMG was given sufficient information to perform the requested auditing services competently. *Id.* Neither

6

Fannie Mae nor its Audit Committee interfered with KPMG's ability to conduct competent audits with due professional care. *Id.* ¶¶ 43, 59.

Time and again, KPMG approved of Fannie Mae's accounting policies, practices, and controls. KPMG repeatedly issued clean audit reports, informing the Audit Committee that there were no material weaknesses in Fannie Mae's internal accounting controls, that Fannie Mae's critical accounting policies and practices were correct, and that Fannie Mae's financial records and accounting practices were GAAP-compliant. *Id.* ¶¶ 45, 46; *see also id.* ¶¶ 47-58.

Throughout the period covered by the Complaint, the Audit Committee relied on KPMG for information about the state of Fannie Mae's accounting, and the Audit Committee sought to ensure that Fannie Mae's accounting was correct. The Audit Committee met regularly with KPMG, and the Committee also received frequent written updates from KPMG. Compl. ¶¶ 47, 48, 50, 53, 56. The Audit Committee specifically questioned the KPMG audit partners on issues of KPMG's independence, quality control procedures, and measures designed to ensure the competence of partners and audit staff. *Id.* ¶ 49. In 2002, when Fannie Mae voluntarily registered with the SEC, the Committee requested that KPMG augment its audit team. *Id.* ¶ 42. When Fannie Mae learned that the SEC had sanctioned KPMG in connection with KPMG's audits of Xerox, the Committee questioned KPMG directly about the SEC's concerns. *Id.* ¶ 51.

The Audit Committee repeatedly relied on the advice and opinions of KPMG on the critical accounting issues facing Fannie Mae. The Audit Committee also asked KPMG to evaluate whether Fannie Mae had "an appropriate 'tone at the top'" regarding ethics and internal controls. *Id.* ¶ 42. And when accounting problems were disclosed by Freddie Mac (a company in a similar business as Fannie Mae), the Audit Committee relied on KPMG for an independent assessment of whether Fannie Mae's accounting suffered from similar flaws. *Id.* ¶ 12.

KPMG consistently provided reassurance to the Audit Committee and to Fannie Mae more broadly. *Id.* ¶¶ 42, 51. KPMG assured the Audit Committee that the "tone at the top" was appropriate, that the SEC allegations against KPMG in connection with Xerox were of no moment, that the audit team was well-qualified, and that Fannie Mae did not have accounting problems similar to those at Freddie Mac. *Id.* ¶ 12. KPMG also gave comfort on specific accounting policies. For example, as part of a separate consulting project, KPMG reviewed and specifically approved Fannie Mae's hedge accounting policies before they were implemented, certifying that they complied with FAS 133. *Id.* ¶¶ 6-8, 62-65.

As events have proved, KPMG's repeated assurances to the Audit Committee were dramatically wrong. KPMG approved accounting policies that did not comply with GAAP for *nearly every major accounting standard* applicable to Fannie Mae's business, including policies that KPMG itself had identified as "significant" or "critical." *Id.* ¶¶ 1, 5, 8, 61. Those GAAP errors — approved by KPMG — involved over *thirty* different issues. *Id.* ¶ 1. Fannie Mae has been forced to spend more than $1 billion in out-of-pocket costs to perform an SEC-mandated restatement and to correct the policies and practices that KPMG either missed or affirmatively approved. *Id.* ¶ 16.

### B. The Elements Of A Prima Facie Claim For Professional Malpractice Are Satisfied.

Under D.C. law, the elements of a professional malpractice claim are the existence of a "duty of care, breach of that duty, proximate causation, and damages." *Plan Committee v. PricewaterhouseCoopers, LLP*, 335 B.R. 234, 247 (D.D.C. 2005) (citing *District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C. 1984)); *see generally Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The Complaint amply alleges each of those elements.

**Duty of care.**  The Complaint alleges that KPMG owed Fannie Mae a duty of care arising from its auditing relationship and its contracts to provide audit services.  The Complaint alleges that KPMG promised (in audit engagement letters and elsewhere):

- "to conduct audits of Fannie Mae's financial statements in accordance with the professional standards contained in GAAS" (Compl. ¶ 36);

- "to 'assess the accounting principles used and significant estimates made by management'" (*id.*);

- to "inform Fannie Mae management about any material errors" (*id.*); and

- to "consider Fannie Mae's internal controls" and to communicate to Fannie Mae's Audit Committee any "significant deficiencies in the design or operation of internal control which could adversely affect [Fannie Mae's] ability to record, process, summarize and report financial data consistent with the assertions of management in the financial statements" (*id.* ¶ 37 (alteration in original)).

The Complaint further alleges that KPMG was "engaged — as supposed experts in hedge accounting — to review Fannie Mae's proposed accounting policies, long before they were adopted, for compliance with FAS 133."  *Id.* ¶ 62.  The Complaint also alleges that, in carrying out those promises and duties, KPMG "owed Fannie Mae, including the Fannie Mae Audit Committee, a duty to use such skill, prudence, and diligence as other reasonable and competent members of the accounting and audit professions commonly possess and exercise."  *Id.* ¶ 76.

**Breach.**  The Complaint alleges that KPMG breached its duties.  The Complaint states, for example, that "KPMG was negligent, failed to exercise . . . skill, prudence and diligence, and failed to exercise due professional care in the services it provided to Fannie Mae."  *Id.*  And although only notice pleading is required, the Complaint goes beyond those requirements by spelling out the numerous specific ways in which KPMG failed to abide by professional standards, alleging among other things that KPMG failed to

- give proper consideration to audit risk and materiality;

- advise the Audit Committee of material weaknesses in internal controls;

9

- document the basis for significant accounting estimates;

- adequately plan and supervise the work of its staff and establish and carry out procedures reasonably designed to search for and detect the existence of material misstatements;

- properly consider the computer processing systems of Fannie Mae as part of the planning and performance of the audits; and

- adequately test and evaluate Fannie Mae's internal controls, including the Internal Audit function.

*See, e.g.*, Compl. ¶¶ 76-100.

**Damages.**  The Complaint alleges that Fannie Mae suffered damages, including "massive expenditures in 2005 and 2006 to review its historical practices, polices, and documentation and conduct research and analysis in order to prepare restatements of its prior financial reports and to prepare new financial reports."  Compl. ¶ 74.  The Complaint alleges that, to date, the costs of the restatement alone "exceed $1 billion, most of which involves fees paid to accountants and outside vendors."  *Id.*

**Proximate causation.**  The Complaint alleges that KPMG's breach of its duties was the proximate cause of extensive damages suffered by Fannie Mae.  *See* Compl. ¶ 74 ("The more than $1 billion Fannie Mae has incurred, and additional amounts Fannie Mae is expected to incur, are a direct and proximate result of KPMG's negligence, malpractice, and failure to comply with the terms of its contractual agreements with Fannie Mae."); *see also, e.g., id.* ¶¶ 111, 119, 124.

In short, the allegations in the Complaint are more than sufficient to establish KPMG's liability for professional malpractice.

## II.     KPMG'S AFFIRMATIVE DEFENSE OF CONTRIBUTORY NEGLIGENCE DOES NOT JUSTIFY DISMISSAL OF THE COMPLAINT.

### A.     An Auditor Cannot Escape Liability For Its Own Malpractice By Relying On The Very Accounting Errors That The Auditor Was Hired To Detect And Remedy.

According to KPMG, Fannie Mae's Complaint is barred by contributory negligence because management, in the first instance, caused the errors that KPMG failed to detect or remedy.  In KPMG's view, the Complaint should be dismissed because it "presupposes and acknowledges contributory fault on the part of Fannie Mae's management."  (KPMG Br. 9.) KPMG asserts that "no more is required to trigger the contributory negligence" bar.  *Id.*  Indeed, according to KPMG, "[a]n allegation that the client's conduct . . . caused an error that the professional failed to catch is *precisely* the kind of claim that the contributory negligence" doctrine bars.  (KPMG Br. 14, emphasis in original.)

Nowhere in its brief does KPMG address the obvious fallacy in that argument:  if any error on the part of management is a bar to an auditor malpractice action, then there is no such thing as an auditor malpractice action.  The central reason why a company (technically, a company's Audit Committee) hires an independent auditor is to perform a *check* on management.  In all companies, management in the first instance formulates and implements accounting policies.  If company managers never made mistakes, there of course would be no need for independent auditors.  But it is precisely because managers can and do make mistakes in formulating or implementing accounting policies that independent auditors exist — hence the word "audit" (and the word "independent").  Put simply, if independent auditors never are liable for their own incompetence in checking on management, then auditors truly have the ideal profession — good pay and no responsibility.

In reality, KPMG's view of the world is contradicted both by the governing canons of the accounting profession and by KPMG's express promises in its own engagement letters with Fannie Mae.  Auditors in the United States are required to conduct audits in accordance with generally accepted auditing standards ("GAAS").  One of those standards imposes on auditors the "*responsibility* to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, *whether caused by error or fraud*." AU § 110.02 (emphasis added).  KPMG expressly accepted that responsibility in its engagement letters with Fannie Mae (which are cited in the Complaint), promising that it would "conduct the audit in accordance with auditing standards generally accepted in the United States," and that the audit would be "planned and performed to obtain reasonable, but not absolute assurance about whether the financial statements are free of material misstatement, *whether caused by error or fraud*."  (*See, e.g.,* Ex. A, emphasis added.)  KPMG cannot disclaim the very responsibility that is imposed by GAAS and that KPMG willingly accepted in its engagement letters.

KPMG's view of the world also is contradicted by the law.  Ever since the seminal case of *National Surety Corp. v. Lybrand*, 9 N.Y.S.2d 554 (App. Div. 1939), courts have recognized that, because auditors are hired for the express purpose of detecting management errors, auditors are not "immune from the consequences of their negligence because those who employ them have conducted their own business negligently."  *Id.* at 563.  In *National Surety*, the head cashier of a stock brokerage firm (Halle & Stieglitz) embezzled more than $300,000 over several years. The cashier also had implemented a check "'lapping' or 'kiting'" scheme to help conceal the thefts.  *Id.* at 556.  The firm hired independent auditors to examine its books.  Under the terms of the audit engagement letters, the auditors' duties "included the verification of cash" balances in the firm's bank accounts.  *Id.* at 559.  Nevertheless, the auditors did not verify the cash balances

with the banks.   Significantly, "if there had been any substantial compliance with the requirements for verifying cash in banks, the cash shortages would have been detected."  *Id.* at 562.  In the ensuing malpractice action, the trial court directed a verdict for the auditors, and the brokerage firm (through the firm's subrogated surety) appealed.

On appeal, the auditors made the precise argument that KPMG makes here — that the brokerage firm's contributory negligence, in permitting its head cashier (Mr. Wallach) to embezzle funds and to conceal the theft by "kiting" checks, barred the action for auditor malpractice:  "The defendants assert that they are not liable, no matter how negligent they may have been, because Halle & Stieglitz [the brokerage firm] were guilty of contributory negligence" by "conduct[ing] their business as to make possible Wallach's defalcations."  *Id.* at 563.  The appellate court rejected that argument, holding that the misconduct of Wallach and the negligence of the brokerage firm in permitting it "did not necessarily excuse the defendants from the consequences of their negligence in failing to discover and report the facts."  *Id.*  The court stressed that the "action is for errors of the accountants in failing to discover Wallach's defalcations," and that the auditors had been hired for the express purpose of detecting exactly that sort of misconduct (*id.*):

> We are, therefore, not prepared to admit that accountants are immune from the consequences of their negligence because those who employ them have conducted their own business negligently. . . . Accountants, as we know, are commonly employed for the very purpose of detecting defalcations which the employer's negligence has made possible.  Accordingly, we see no reason to hold that the accountant is not liable to his employer in such cases.

The court concluded that unless there is some sort of interference with the competent performance of the audit by persons other than those who made the mistakes or defalcations that the auditor was hired to detect, the auditors are liable if a competent audit would have caught the errors.  *See id.*

The principle of *National Surety* has been consistently adopted by jurisdictions addressing auditor malpractice claims in a *contributory negligence* context – as well as by a number of courts in comparative negligence jurisdictions. For example, in *Fullmer v. Wohlfeiler & Beck*, 905 F.2d 1394, 1397 (10th Cir. 1990), the Tenth Circuit upheld a judgment against an auditor for malpractice, rejecting the auditor's contention that the judgment did not reflect the client's own negligence:

> We agree with the view of the *National Surety* and *Shapiro* [*v. Glekel*, 380 F. Supp. 1053 (S.D.N.Y. 1974)] courts that accountants are not to be rendered immune from the consequences of their own negligence merely because those who employ them may have conducted their own business negligently. Allowing such a defense would render illusory the notion that an accountant is liable for the negligent performance of his duties.

*Id.* at 1398 (quoting *Lincoln Grain, Inc. v. Coopers & Lybrand*, 345 N.W.2d 300, 307 (Neb. 1984)). Likewise, in *Comeau v. Rupp*, 810 F. Supp. 1172, 1183 (D. Kan. 1992), the court reached the same result, denying an auditing firm's motion for summary judgment:

> In effect, the accountant assumes a duty toward the client to protect the client from certain of the client's own negligent actions. Given these duties, it would be curious indeed if the accountant were then allowed to interpose as a defense the very injurious negligence of the client that the accountant has assumed a duty to discover and correct.

The court further held that auditors cannot evade that principle by contending that the client's negligence made "the Accountants' job . . . more difficult" and "increase[d] the likelihood of auditor error." *Id.* at 1183-84. Rather, the interfering conduct must be something "outside of that which is reasonably foreseeable by auditors" (*id.* at 1184):

> The court rejects this restrictive reading of *National Surety*, for it would effectively eviscerate the rule. The court can safely assume that deficient bookkeeping practices by the client will always make the accountant's job "more difficult" and in that sense will increase the likelihood of auditor error. Under the Accountants' formulation, recovery would be allowed only to the client who diligently maintains exemplary books and obligingly documents his mis- or malfeasance for the convenient review of his auditor, thereby eliminating any auditor duty to look beyond the representations of the client. In the court's view,

14

contributory negligence of a type envisioned by *National Surety* is client negligence that contributes to the auditor's failure to report the truth because it is negligence outside of that which is reasonably foreseeable by auditors.

Court after court has applied that principle to reject arguments by auditors that they can escape liability for their own malpractice by relying on the very accounting errors that the auditors were hired to detect and remedy. *See, e.g., Board of Trustees of Community College District No. 508 v. Coopers & Lybrand*, 803 N.E.2d 460, 467 (Ill. 2003) (rejecting auditor's claim of contributory negligence and holding that the *National Surety* principle is "consonant with the general tort principles applicable to actions against service providers and, in the accounting malpractice context, consistent with the Restatement (Third) of Torts"[2]); *Stroud v. Arthur Andersen & Co.*, 37 P.3d 783, 790 (Okla. 2001) (rejecting auditor's claim of contributory negligence: "[T]o hold otherwise would render illusory the notion that an accounting firm is negligent when its performance breaches the duty of care it owes as a professional to the public and causes injury. An accountant cannot defend his/her deficient professional conduct by asserting that its client was also negligent unless the client's conduct can be proven to have interfered with the accountant's provision of professional services."); *Lincoln Grain, Inc. v. Coopers & Lybrand*, 345 N.W.2d 300, 307 (Neb. 1984) (client's negligence is a defense only if it "contributed to [the accountant's] failure to perform the contract and to report the truth"); *Jewelcor Jewelers & Distribs., Inc. v. Corr*, 542 A.2d 72, 79-80 (Pa. Super. Ct. 1988); *Shapiro v. Glekel*, 380 F. Supp. 1053, 1056-58 (S.D.N.Y. 1974).

Consistent with that line of authority, the *Restatement (Third) of Agency* makes that point explicitly, stating that an auditor hired to access the adequacy of management's financial

---

[2] The *Restatement (Third) of Torts*, adopted in 2000, makes clear that even in comparative negligence jurisdictions, "in a case involving negligent rendition of a service, . . . a factfinder does not consider any plaintiff's conduct that created the condition the service was employed to remedy." *Restatement (Third) of Torts*, Apportionment of Liability § 7 cmt. m (2000).

reporting and controls cannot use even management's purported knowledge of those inadequacies to escape malpractice liability:

> A principal may retain a service provider on terms or for tasks that make imputation of an agent's knowledge irrelevant to subsequent claims that the principal may assert against the service provider. For example, a principal may retain a service provider to assess the accuracy of its financial reporting or the adequacy of its internal financial controls . . . . If the service provider fails to detect or report deficiencies, the principal's claim against the service provider should not be defeated by imputing to the principal its agents' knowledge of deficiencies in the process under scrutiny.

*Restatement (Third) of Agency* § 5.03 cmt. b, at 361 (2006); *accord, Restatement (Third) of Torts,* Apportionment of Liability § 7 cmt. m (2000) (quoted *supra*, note 2).

Therefore, under the principle of *National Surety*, and as the *Restatement (Third) of Agency* confirms, an auditor cannot escape liability for its own malpractice by relying on the very accounting errors that the auditor was hired to detect and remedy.

**B.    District of Columbia Courts Would Follow *National Surety*.**

Although the D.C. Court of Appeals has not been presented squarely with the issue in an auditor malpractice case, there is little doubt that the D.C. Court of Appeals would follow the long line of cases applying *National Surety* in contributory negligence jurisdictions. As KPMG acknowledges in its brief, a district court faced with a question of state or local law "must seek to discern . . . how the D.C. Court of Appeals would rule on the issue." *See* KPMG Br. 11 (quoting *Tripp v. United States*, 257 F. Supp. 2d 37, 42 (D.D.C. 2003)); *accord Siegel v. Mazda Motor Corp.*, 835 F.2d 1475, 1478 (D.C. Cir. 1987) (federal court must use "best effort to project or predict how the District of Columbia courts would rule").

*First*, as shown above, to Fannie Mae's knowledge, no court that has addressed *National Surety* in a contributory negligence audit malpractice case has rejected it, and multiple courts have followed its unassailable logic. *E.g., Curtis Packaging Corp. v. KPMG, LLP*, No.

16

X06CV990156558S, 2002 WL 31015828, at *5-*6 (Conn. Super. Ct. July 31, 2002); *Comeau*, 810 F. Supp. at 1181-83 (D. Kan. 1992); *Jewelcor*, 542 A.2d at 79-80 (Pa. Super. Ct. 1988); *Shapiro*, 380 F. Supp. at 1054-58 (S.D.N.Y. 1974); *Cereal Byproducts Co. v. Hall*, 132 N.E.2d 27, 29-30 (Ill. App. Ct. 1956).[3]

*Second*, the D.C. Court of Appeals repeatedly has adopted other rules that mitigate the harsh effects of contributory negligence. The D.C. Court of Appeals has embraced, for example, the doctrine of "last clear chance." Under that doctrine, where the negligence of both the plaintiff and the defendant places the plaintiff in a position of physical danger, the plaintiff may still recover if the defendant could have averted injury to the plaintiff but failed to do so. *See, e.g., Hall v. Carter*, 825 A.2d 954, 958 (D.C. 2003). Similarly, the D.C. Court of Appeals has held in the medical malpractice context that when a doctor negligently treats a person injured earlier by the person's own negligence, contributory negligence will not bar relief. *See Durphy v. Kaiser Found. Health Plan of Mid-Atlantic States, Inc.*, 698 A.2d 459, 467 (D.C. 1997). The *National Surety* principle — a modest application of the contributory negligence rule that mitigates its harsher and less sensible effects — is cut from the same cloth.

---

[3] *Wegad v. Howard Street Jewelers, Inc.*, 605 A.2d 123 (Md. 1991), which addressed the issue of the propriety of a particular jury instruction involving contributory negligence, is not to the contrary. *Wegad*, an action against an individual accountant, did not address *National Surety* at all, and did not involve the performance of an audit. The court noted that the accountant's engagement letter in that case expressly stated that an audit was *not* being performed, and that the accountant's work was *not* "designed and cannot be relied upon to disclose fraud, defalcations or other irregularities." 605 A.2d at 127 n.3. Moreover, as noted above, a number of courts have concluded that the *National Surety* principle applies even in comparative negligence situations because that principle delineates what type of negligence by the client can be weighed against the auditor's negligence. *See, e.g., Fullmer*, 905 F.2d at 1399 (10th Cir. 1990) ("The persuasive analysis in Menzel, *The Defense of Contributory Negligence in Accountant's Malpractice Actions*, 12 Seton Hall 292 (1983), makes no distinction between contributory negligence and comparative negligence regimes."); *Board of Trustees*, 803 N.E.2d at 466-67 (analyzing issue); *Stroud*, 37 P.3d at 789-90; *Lincoln Grain*, 345 N.W.2d at 306-07; *Grant Thornton, LLP v. FDIC*, No. 1:00-0655, slip op. at 102 (S.D. W. Va. Mar. 14, 2007).

*Third*, although the D.C. Court of Appeals has not yet had the opportunity to consider the provisions in the new *Restatement (Third) of Agency*, the court regularly adopts Restatement principles. *See, e.g., Ellis v. James V. Hurson Assocs., Inc.*, 565 A.2d 615, 618 (D.C. 1989) (stating that "[i]n the absence of any current well-developed doctrine in our jurisdiction, [the court will] adopt [the Restatement's] modern and authoritative exposition insofar as it applies to the case before us"); *accord Weakley v. Burnham Corp.*, 871 A.2d 1167, 1177 (D.C. 2005) (applying Section 1 of the *Restatement (Third) of Torts: Products Liability*).

*Fourth*, the principle of *National Surety* and the Restatement is the only sensible one. As the abundance of precedent in this area makes clear, it makes no sense to say that, where a plaintiff hires a professional to detect and correct certain conditions, the plaintiff's negligence in creating those conditions absolves the professional of responsibility for failing to "perform[] the very duties he assumed." *Steiner Corp. v. Johnson & Higgins of Cal.*, 135 F.3d 684, 688 (10th Cir. 1998); *see Board of Trustees*, 803 N.E.2d at 467-68 (Ill. 2003); *Comeau*, 810 F. Supp. at 1183 (D. Kan. 1992). The principle of *National Surety* and the Restatement is essential to prevent the tort of auditing malpractice from becoming a dead letter.

*Finally*, in its engagement letters, KPMG promised to provide "reasonable . . . assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." KPMG's *express promise* to use reasonable efforts to uncover "error or fraud" forecloses KPMG's argument that any error in "Fannie Mae's accounting" renders KPMG immune from suit. *See generally Cumis Ins. Soc'y, Inc. v. Tooke*, 739 N.Y.S.2d 489, 492 (App. Div. 2002) (reversing grant of summary judgment for accountant who failed to detect fraud by client's employee in part because engagement letters provided that "the audit is designed to

provide reasonable assurance of detecting errors and irregularities that are material to the financial statements") (internal quotation marks omitted).

### C.    Contributory Negligence Is A Question Of Fact That Cannot Be Resolved At The Rule 12(b)(6) Stage.

In addition to all the legal principles shown above, KPMG's effort to dismiss the malpractice claim against it based upon Fannie Mae's supposed contributory negligence fails for another independent reason:  contributory negligence, like ordinary negligence, is a question of fact that cannot be decided on a Rule 12(b)(6) motion to dismiss.  The D.C. Court of Appeals "has made it abundantly clear that contributory negligence is almost always a question of fact for the jury." *Jeffries v. Potomac Dev. Corp.*, 822 F.2d 87, 91 (D.C. Cir. 1987).  More specifically, like ordinary negligence, contributory negligence entails factual determinations as to the standard of care, the plaintiff's conduct, and causation.  *See, e.g.*, *Maalouf v. Swiss Confederation*, 208 F. Supp. 2d 31, 42 (D.D.C. 2002) (analogizing the burden of proving contributory negligence to the burden of proving ordinary negligence); *Lynn v. District of Columbia*, 734 A.2d 168, 172 (D.C. 1999).  As a result, even a grant of *summary judgment* on contributory negligence grounds is "rare and exceptional."  *Paraskevaides v. Four Seasons Wash.*, 292 F.3d 886, 893 (D.C. Cir. 2002).  Dismissal in the setting of a Rule 12(b)(6) motion — intended solely to test the legal sufficiency of the plaintiff's complaint — is rarer still.

That is all the more so because contributory negligence is not an aspect of the plaintiff's complaint at all, but rather is an affirmative defense that the *defendant* must plead and prove. *Aetna Cas. & Surety Co. v. Carter*, 549 A.2d 1117, 1119 (D.C. 1988); *see also Jones v. Rogers Mem'l Hosp.*, 442 F.2d 773, 775 (D.C. Cir 1971) (affirmative defenses "need not be negatived by the language of the complaint"); 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 708-10 (3d ed. 2004) (dismissal on basis of affirmative

19

defense is appropriate only if "the applicability of the defense [is] clearly indicated and . . . appears[s] on the face of the pleading").

Accordingly, even if KPMG had stated the law of contributory negligence correctly (which, as shown above, KPMG has not), the Complaint could not be dismissed.  The Complaint does not allege negligence by Fannie Mae or its Audit Committee.  Nor does the Complaint allege facts that, as a matter of law, render Fannie Mae or its Audit Committee negligent.  Indeed, the Complaint alleges precisely the opposite: namely, that "Fannie Mae and its Audit Committee acted reasonably."  (Compl. ¶ 43.)  The Complaint is also devoid of any allegations that would establish the applicable standard of care for Fannie Mae, much less any allegations that would establish a violation of that standard.  *See District of Columbia v. Hampton*, 666 A.2d 30, 35-36 (D.C. 1995) (generally requiring expert testimony to prove the standard of care in professional malpractice cases).  Thus, any purported negligence on the part of Fannie Mae cannot justify dismissal.

Finally, because the allegations in the Complaint refute any assertion that Fannie Mae interfered with KPMG's ability to do its work competently, KPMG cannot use that avenue to obtain dismissal, either.  *See, e.g.*, Compl. ¶ 43 ("Fannie Mae and its Audit Committee acted reasonably and did not interfere with KPMG's ability to conduct competent audits with due professional care"); *id.* ("KPMG was provided with sufficient information to perform the requested auditing services competently").

In fact, KPMG cannot possibly assert that Fannie Mae or its Audit Committee supposedly interfered with *all* aspects of the audits.  The Complaint alleges that KPMG failed its audit duties in over *thirty* different categories of accounting polices and practices, including errors relating to FAS 115, 125, 133, 140, and 149.  *E.g.,* Compl. ¶ 72.  KPMG does not even attempt to argue that

Fannie Mae prevented KPMG from conducting competent audits with respect to every one of these accounting standards. To the contrary, even after the OFHEO report was issued in September 2004, KPMG represented to the SEC that KPMG had reviewed Fannie Mae's proposed accounting policies under FAS 133 before they were implemented, and that KPMG agreed with those policies. KPMG does not even contend that it was prevented from conducting a proper audit as to FAS 133 — the single largest area of the restatement — and does not contend it was misled in any way as to a host of other accounting issues Fannie Mae was forced to restate. That fact alone precludes dismissal of the Complaint.

Thus, to the extent that KPMG wants to contradict the Complaint's allegations of non-interference, issues of fact also exist concerning any audit failures where KPMG wants to claim interference. *See, e.g., Holland v. Arthur Andersen & Co.*, 469 N.E.2d 419, 427 (Ill. App. Ct. 1984) (reversing dismissal because "it does not appear that there are any allegations in [the plaintiff's] complaint or in its exhibits that indicate that [the plaintiff] took any actions that prevented [the auditor] from properly conducting itself as [the plaintiff's] independent auditor[]").

In sum, the factual allegations of the Complaint and the legal principle of *National Surety* and the *Restatement (Third) of Agency* preclude dismissal on the basis of contributory negligence.

## III.    KPMG'S AFFIRMATIVE DEFENSE OF *IN PARI DELICTO* DOES NOT JUSTIFY DISMISSAL OF THE COMPLAINT.

### A.    The *In Pari Delicto* Doctrine Requires Fraud Rather Than Negligence, And Fraud Is Not Alleged In The Complaint.

In addition to suffering from the same defects as KPMG's contributory-negligence defense, KPMG's *in pari delicto* defense fails for another threshold reason: the doctrine requires more than negligence or mere error on the part of the plaintiff. The doctrine requires outright

fraud, and no fraud is alleged in the Complaint here.   KPMG's view of the law is simply incorrect.  Fannie Mae is aware of no case, and KPMG has cited none, in which a negligent error by a plaintiff was held to justify application of *in pari delicto*.  Rather, the doctrine requires outright fraud or other intentionally illegal conduct by the plaintiff.   *See, e.g., Washington Gaslight Co. v. District of Columbia*, 161 U.S. 316, 327 (1896) (interpreting "in pari delicto" maxim to bar recovery only if the plaintiff and defendant are "equally criminal").[4]

Indeed, the cases cited by KPMG establish that point.  Fraud or criminal misconduct is the hallmark of every case that KPMG cites to support its *in pari delicto* theory.  *See, e.g.*, *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449, 454 (7th Cir. 1982) ("[A] participant in a fraud cannot also be a victim entitled to recover damages, for he cannot have relied on the truth of the fraudulent representations, and such reliance is an essential element in a case of fraud.").  None of the cases that KPMG cites provides any grounds for dismissal on *in pari delicto* grounds where, as here, a complaint does not allege any fraud or other similar wrongdoing by the plaintiff.  Far from alleging fraud by Fannie Mae or its Audit Committee (or even negligence — see Part II.C above), the Complaint affirmatively alleges the opposite — that "Fannie Mae and its Audit Committee acted reasonably and did not interfere with KPMG's ability to conduct competent audits with due professional care."  Compl. ¶ 43.

Nor does KPMG assert otherwise in its brief.  The only thing close to such a contention is KPMG's statement that "Fannie Mae alleges that [its claims] involve the same kind of conduct as the audits of two other KPMG clients."  KPMG Br. 14.  In reality, the Complaint alleges only

---

[4] Indeed, if negligence alone were enough to trigger *in pari delicto*, then there would be no need at all for the contributory negligence doctrine — it would not exist as a defense because it never would be needed.   The result would be still more striking in comparative negligence jurisdictions:  all of those jurisdictions would effectively become contributory negligence jurisdictions, because any fault by the plaintiff would completely bar recovery.

that those audits, like KPMG's audits of Fannie Mae, involved violations of professional standards by KPMG.  *See* Compl. ¶¶ 50-52, 103-104.  The Complaint does not draw any comparison, as KPMG incorrectly suggests, between the conduct of KPMG's other clients and the conduct of Fannie Mae and its Audit Committee.

In short, the absence of allegations of fraud by Fannie Mae in the Complaint precludes dismissal on *in pari delicto* grounds.

> **B.    An Auditor Cannot Escape Liability For Its Own Malpractice By Relying On A Purported Fraud That The Auditor Was Hired To Detect And Remedy.**

Even if KPMG could show fraud on the part of management at Fannie Mae, which KPMG cannot do, KPMG still could not use that fraud to establish an *in pari delicto* defense. That is so for the same reasons shown above with respect to contributory negligence — namely, the principles underlying *National Surety* and the *Restatement (Third) of Agency*.  Put simply, when an independent and functioning Audit Committee exists and hires an auditor for the express purpose of checking for incorrect accounting statements — "whether caused by error or fraud" (Ex. A, KPMG engagement letter) — the auditor cannot defend its failure to perform a competent audit by relying on the fraud that its incompetent audit failed to detect.

The existence of an independent Audit Committee is important because, if the auditor detects fraud and reports it to the Audit Committee (as auditors must do), the Audit Committee has the ability to end the fraud, no matter how high in the management ranks the fraud goes. Again, that is precisely why auditors report to Audit Committees rather than to management. Audit Committees hire auditors to check on incorrect accounting statements by management, "whether caused by error or fraud."

That principle — that auditors cannot rely as a defense on the very fraud that they were hired to detect — is the exact holding of a recent decision by the New Jersey Supreme Court in

another accounting malpractice case against KPMG.   In *NCP Litigation Trust v. KPMG LLP*, 901 A.2d 871 (N.J. 2006), the court rejected a similar attempt by KPMG to invoke *in pari delicto* to shield itself from the consequences of its negligent auditing.   The court explained that the defense "exists to protect innocent third parties from being sued by corporations whose agents have engaged in malfeasant behavior against those third parties."   *Id.* at 882.   Emphasizing that "KPMG had an independent contractual obligation . . . to detect the fraud," the court reasoned that "[a]llowing KPMG to avoid liability for its allegedly negligent conduct would not promote the purpose of the imputation doctrine — to protect the innocent."   *Id.*   Thus, the court concluded, "a claim for negligence may be brought on behalf of a corporation against the corporation's allegedly negligent third-party auditors for damages proximately caused by that negligence."   *Id.*; *see also In re Integrity Ins. Co.*, 573 A.2d 928 (N.J. Super. Ct. App. Div. 1990).

A California court reached the same conclusion in *Targus Group International, Inc. v. KPMG LLP*, No. 03CC2302 (Cal. Super. Ct. Jan. 30, 2003), yet another malpractice case against KPMG.   There, too, KPMG sought to use the company's fraud to obtain immunity for KPMG's negligent audits.   The court stressed that "[p]art of KPMG's undisputed role in its audits was to review TGII's financial statements and other financial books and records and to perform tests to obtain reasonable assurance that the financial statements were free from material misstatement due to error or fraud."   Ex. B, Slip Op. at 5.   In that situation, "KPMG cannot simply impute to TGII the very fraud it did not find."   *Id.* at 6.

As shown above, the Restatement (Third) of Agency makes the same point.   The Restatement makes clear that when an auditor is hired "to assess the accuracy of [a company's] financial reporting or the adequacy of its internal financial controls," the auditor cannot defend

by pointing to the deficiencies it was retained to detect: "If the service provider fails to detect or report deficiencies, the principal's claim against the service provider should not be defeated by imputing to the principal its agents' *knowledge of deficiencies in the process under scrutiny*." *Restatement (Third) of Agency* § 5.03 cmt. b, at 361 (2006) (emphasis added).

That last phrase in the Restatement — "knowledge of deficiencies in the process under scrutiny" — is critical because it reflects the principle of *National Surety* and all of the cases following it. *See* Part II.A above. Significantly, *National Surety* involved intentional wrongdoing by the company's head cashier — indeed, outright theft and the kiting of checks to conceal it. As the Restatement (and *National Surety*) make clear, a negligent auditor cannot assert as a defense that, because the faithless employee knew of his own improper conduct, the faithless employee's knowledge is imputed to the company. The knowledge by company employees of the "process under scrutiny" — that is, the head cashier's knowledge that he was stealing from the company and affirmatively concealing it — cannot be used as a defense by an auditor hired to perform the "scrutiny." Put another way, the auditor cannot use a malfeasant employee's *own* knowledge of his *own* wrongdoing to escape the auditor's contractual duty to detect that very misconduct.

That is not to say that the auditor might not have other legitimate excuses for failing to detect the fraud. For example, the fraud might be so clever and so concealed that normal auditing procedures under GAAS, competently applied, would not catch it. *See, e.g., National Surety*, 9 N.Y.S.2d at 563 (recognizing that other conduct of company could interfere with auditor's ability to perform its audit). But as the Restatement and *National Surety* make clear, that "other conduct" cannot be the very conduct that the auditor was hired to detect. *Accord Comeau*, 810 F. Supp. at 1184 (requiring misconduct by client "outside of that which is

reasonably foreseeable by auditors"). Whether any such fraud was foreseeable, and whether the fraud was so well hidden that a properly planned and executed audit could not detect it, are classic questions of fact that cannot be resolved on a motion to dismiss.

The Restatement position and the *National Surety* principle underlying it are consistent with legislative and regulatory pronouncements, issued prior to KPMG's conduct at issue here but long after many of the cases upon which KPMG's *in pari delicto* defense is premised. Those pronouncements have substantially expanded an auditor's duty to expose corporate misconduct. The Private Securities Litigation Reform Act of 1995 provides that, where a securities issuer's board of directors fails to report certain illegal conduct to the SEC, the auditor itself must do so. *See* 15 U.S.C. § 78j-1(a)(1) and (b)(3) to (4) (requiring auditor to design procedures "to provide reasonable assurance of detecting illegal acts" by client and to "furnish to the Commission a copy of the [auditing firm's] report" on any fraud that is found). Further, Statement of Auditing Standards (SAS) 82, adopted in 1997 and titled "Consideration of Fraud in a Financial Statement Audit," singled out and clarified the auditor's duties with respect to material misstatements caused by fraud. That provision similarly imposed on auditors a duty to plan and perform the audit "to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 110.02; *see also* AU § 316, *et seq.* (enhancing that duty); *Observations on Auditors' Implementation of PCAOB Standards Relating to Auditors' Responsibilities with Respect to Fraud*, PCAOB Release No. 2007-001 (Jan. 22, 2007) (discussing, with reference to audit standards in place at the time of the events at issue here, various aspects of auditor's "responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, including misstatements caused by fraud"); Compl. ¶ 77 (alleging that KPMG failed to "establish

and carry out procedures reasonably designed to search for and detect the existence of material misstatements").

Those auditing standards, existing at the time KPMG's malpractice occurred, make it all the more inappropriate to excuse KPMG's negligent failure to detect exactly what it was hired to detect. *See In re Cendant Corp. Secs. Litig.*, 139 F. Supp. 2d 585, 597 (D.N.J. 2001) ("Especially given the recent changes in accounting standards and the increased duties of auditors to report misstatements both to the SEC and to management, *Cenco*'s concern that a company guilty of fraud might be able to shift liability in its entirety does not apply.").

Despite all of that law — none of which KPMG cites — KPMG relies on several other cases to support its *in pari delicto* argument. KPMG Br. 11-13. As noted above, all of those cases involved suits in which the plaintiffs *admitted fraud* by the company's management.[5] That distinction is dispositive here. In *Baena v. KPMG LLP*, 453 F.3d 1 (1st Cir. 2006), for example (a statutory deceptive-trade-practice claim), the complaint itself showed that the Chairman of the Board, the CEO, and the managing directors all *knowingly* falsified financial statements.

Moreover, five of the cases cited by KPMG did not involve suits against accountants at all. *See In re Dublin Secs., Inc.*, 133 F.3d 377 (6th Cir. 1998) (malpractice and other claims

---

[5] *See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 358-59 (3d Cir. 2001); *In re Dublin Secs.*, 133 F.3d 377, 379 (6th Cir. 1997); *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1148 (11th Cir. 2006), *cert. denied*, 127 S. Ct. 45 (2006); *Baena v. KPMG LLP*, 453 F.3d 1, 7 (1st Cir. 2006); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 155 (2d Cir. 2003), *aff'g*, 80 F. Supp. 2d 129, 138 (S.D.N.Y. 1999) (referring to board-approved transaction as "fraudulent conduct"); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088-90 (2d Cir. 1995); *In re Greater S.E. Cmty. Hosp. Corp. I*, 353 B.R. 324, 333 (Bankr. D. Colo. 2006); *Official Committee of Unsecured Creditors of Allegheny Health, Educ. Research Found. v. PricewaterhouseCoopers*, No. 2:00cv684, 2007 WL 141059, at *13 (W.D. Pa. Jan. 17, 2007); *see also FDIC v. Ernst & Young*, 967 F.2d 166, 168 (5th Cir. 1992); *cf. Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118-20 (2d Cir. 1991).

against law firms and lawyers); *In re Greater S.E. Cmty. Hosp. Corp. I*, 353 B.R. 324 (D.D.C. 2006) (malpractice and breach of fiduciary duty claims against law firms); *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145 (11th Cir. 2006) (RICO and other claims against IRA custodians for helping corporate manager perpetrate Ponzi scheme); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001) (accountants settled prior to appeal; appellate decision involved claims against other professionals for rendering opinions that facilitated fraudulent sale of debt certificates); *Wager v. Pro*, 575 F.2d 882 (D.C. Cir. 1976) (government employee's claim against employer arising out of employee's solicitation of bribes at employer's behest).  Two other cases, though involving claims against accountants, did not arise out of their performance of an audit function — so the courts had no occasion to consider a scenario where the defendant was hired to detect and report errors by the plaintiff or its employees.  *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) (claims arising out of accounting firm's performance of due diligence and financial analyses relating to Ponzi scheme perpetrated by corporate managers); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 154 & n.3 (2d Cir. 2003) (claims arising out of consulting services provided by accounting firm in connection with corporate acquisition and bond offering, where bankruptcy trustee already had abandoned claims arising out of accounting firm's negligent certification of corporation's financial statements), *aff'g*, 80 F. Supp. 2d 129 (S.D.N.Y. 1999).

*Cenco v. Seidman & Seidman*, 686 F.2d 449 (7th Cir. 1982), one of the early cases KPMG cites, did not even address the argument that *in pari delicto* does not apply where a functioning and truly independent Audit Committee would have stopped any fraud and corrected any errors had the auditor complied with its professional obligations.  In addition, *Cenco* was

28

decided prior to many of the enhanced standards requiring accounting firms to plan and execute audits to provide reasonable assurance that the financial statements are not misstated due to error or fraud.

The existence of a functioning and independent Audit Committee that hires an outside auditor to look for fraud defeats the entire rationale for the *in pari delicto* defense. As the court explained in *Cenco*, "a participant in a fraud cannot also be a victim entitled to recover damages, *for he cannot have relied on the truth of the fraudulent representations*, and such reliance is an essential element in a case of fraud." *Cenco,* 686 F.2d at 454 (7th Cir. 1982) (emphasis added). Here, even if there were a fraud (which there was not, *see* Part III.A above), the Audit Committee did not know about it and thus *did* rely on the truth of KPMG's representations that Fannie Mae's accounting complied with GAAP. The Audit Committee, which stood ready to stop any misconduct, simply was not part of any alleged wrongdoing (the "*delicto*" element of the doctrine).

KPMG's brief never once mentions the phrase "Audit Committee." But elsewhere, KPMG has acknowledged the importance of the Audit Committee and the ultimate responsibility of the auditor to the Audit Committee. *See* KPMG, *Basic Principles for Audit Committees* (2002) (Ex. C) ("The ultimate accountability of the external auditor to the board and the audit committee must be more than words in the audit committee charter"). That well-settled and longstanding principle has been reinforced by the provisions of the Sarbanes-Oxley Act. *See* 15 U.S.C. § 78j-1(m)(2) (Audit Committee "shall be directly responsible for the appointment, compensation, and oversight of the work of any registered public accounting firm employed by the issuer . . . , and each such registered public accounting firm shall report directly to the audit committee").

Here, as the Complaint alleges, Fannie Mae had a true, independent Audit Committee that acted reasonably — including by hiring KPMG to analyze the "quality" of Fannie Mae's accounting and to detect errors or fraud in the company's financial reports.  If Fannie Mae's Audit Committee had been informed of the accounting errors that KPMG negligently failed to detect (not to mention any supposed fraud), the Audit Committee would have put an end to those errors and avoided the costly restatement and related investigations.  Compl. ¶¶ 4, 14, 59, 66-67, 70.  We know that is true because, as detailed above and in the Complaint, the Audit Committee actively questioned KPMG about the qualifications of its auditors, about Fannie Mae's critical accounting policies and internal controls, and about specific accounting issues such as the accounting problems discovered at Freddie Mac.  Each time, KPMG assured the Audit Committee that everything was proper.  *See* Part I above; Compl. ¶¶ 45-61.  All of these allegations must be accepted as true for purposes of KPMG's motion to dismiss.

Finally, as with contributory negligence, KPMG does not cite any D.C. case applying *in pari delicto* in the setting of accountant malpractice — or in the setting of any other professional malpractice, for that matter.  D.C. has recognized *in pari delicto* only in contexts quite different from this one.  *See, e.g.*, *Fields v. Hunter*, 368 A.2d 1156, 1159 (D.C. 1977) (suit between parties to illegal transaction); *Quadrangle Dev. Corp. v. Otis Elevator Corp.*, 748 A.2d 432, 435 (D.C. 2000) (suit for contribution among joint tortfeasors).  As shown above with regard to contributory negligence, all indications are that the D.C. Court of Appeals, when presented with the issue, will adopt the view reflected in the 2006 *Restatement (Third) of Agency* and the cases described above that a negligent auditor cannot escape liability by invoking the very fraud that it was hired to detect.

### C.    *In Pari Delicto* Is A Question Of Fact That Cannot Be Resolved At The Rule 12(b)(6) Stage.

As with contributory negligence, KPMG's motion must be denied – even under KPMG's view of the law – because both the "delicto" part and the "in pari" part of *in pari delicto* are questions of fact that cannot be decided on a motion to dismiss.  Fannie Mae strongly disputes that there was any "delicto" on its part, much less any "delicto" by the Audit Committee.  Likewise, whether any "delicto" by Fannie Mae or its Audit Committee is commensurate with the fault of KPMG for each type of accounting error cannot be decided without evidence.

The Complaint alleges that KPMG failed its audit duties in over thirty different accounting policies or practices, involving virtually every accounting principle central to financial institutions.  In simple terms, a client's fraud as to $1,000 worth of inventory cannot immunize the auditor from any responsibility for an incompetent audit on unrelated issues — such as derivative and hedge accounting policies that the auditor admits it reviewed and approved.  Thus, even under KPMG's *in pari delicto* theory, issues of fact exist as to which of KPMG's many audit failures were affected by the supposed "delicto" of Fannie Mae.

In short, there is no basis for dismissing the Complaint on *in pari delicto* grounds.

## IV.    KPMG'S INVOCATION OF "JUDICIAL ESTOPPEL" IS WITHOUT MERIT.

Unable to prevail on its motion to dismiss if it confines its arguments to the four corners of the Complaint, KPMG also relies upon a host of disputed factual assertions extrinsic to the Complaint.  *See* KPMG Br. 16-17.  Although this Court may not generally consider materials outside the Complaint on a Rule 12(b)(6) motion, *see* Fed. R. Civ. P. 12; *Currier v. Postmaster Gen.*, 304 F.3d 87, 88 (D.C. Cir. 2002), KPMG attempts to bootstrap selected statements from Fannie Mae's press releases and from motions Fannie Mae filed in the federal securities fraud class actions into an argument that thousands of pages of contestable statements in other extrinsic

31

documents must be accepted as binding — even at the stage of this Rule 12(b)(6) motion.  *See* KPMG Br. 18-22 (arguing that the Court must accept all findings in the Rudman Report and the September 2004 OFHEO Report).  KPMG's argument, if accepted, would eviscerate the well-settled limits on material to be considered on a Rule 12(b)(6) motion and usurp the role of the jury as the means for resolving disputed issues of material fact.  KPMG's argument, however, is entirely meritless.

### A.    Judicial Estoppel Is A Doctrine Of Limited Scope.

At the threshold, judicial estoppel is a disfavored doctrine that applies only in the "narrowest of circumstances."  *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1069 (10th Cir. 2005); *see also 1000 Friends of Maryland v. Browner*, 265 F.3d 216, 227 (4th Cir. 2001) (same); *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005) (risk of inconsistent results and concomitant impact on judicial integrity must be "certain"); *Eubanks v. CBSK Fin. Group, Inc.*, 385 F.3d 894, 897 (6th Cir. 2004); *see generally New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  In those narrow circumstances, judicial estoppel "preclude[s] a party from taking a position that is inconsistent with one successfully asserted by the same party in a prior proceeding."  *United Mine Workers of Am. 1974 Pension v. Pittston Co.*, 984 F.2d 469, 477 (D.C. Cir. 1993) (describing, but refusing to recognize, the doctrine).

Judicial estoppel requires at a minimum that "a party's later position . . . be *clearly inconsistent* with its earlier position" and that the party have succeeded "in persuading *a court* to accept that party's earlier position."  *New Hampshire*, 532 U.S. at 750-51 (emphasis added); *see also SEC v. Happ*, 392 F.3d 12, 20 (1st Cir. 2004) (requiring litigant's positions to be "directly inconsistent" and the contradiction to be "intentional").  In addition, courts ask whether the party sought to be estopped would "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *New Hampshire*, 532 U.S. at 750-51.

The reason for courts' discomfort with judicial estoppel is obvious: "the doctrine precludes a contradictory position without examining the truth of either statement," and thus judicial estoppel has the potential to erode "the truth-seeking function of the court." *Eubanks*, 385 F.3d at 897 (internal quotation marks omitted). For that reason, prior to *New Hampshire v. Maine*, the D.C. Circuit had steadfastly refused to adopt judicial estoppel. *See, e.g.*, *United Mine Workers of Am.*, 984 F.2d at 477. And after *New Hampshire*, KPMG does not cite (and Fannie Mae is not aware of) any opinion from the D.C. Circuit or from a D.C. District Court that has accepted a judicial estoppel argument. As another court in this Circuit recently noted in declining to apply judicial estoppel, "the D.C. Circuit has been wary of a doctrine so 'out of harmony with [the modern rules of pleading]' and at odds with the truth-seeking function of courts." *Smith v. United States*, 277 F. Supp. 2d 100, 115 n.10 (D.D.C. 2003) (quoting *American Methyl Corp. v. EPA*, 749 F.2d 826, 833 (D.C. Cir. 1984) (alteration in original)); *see also, e.g.*, *Howard v. Gutierrez*, 2007 WL 404352, at *9 (D.D.C. Feb 6, 2007) (rejecting judicial estoppel argument); *Smith*, 277 F. Supp. 2d at 115 (same); *Sanders v. Dist. of Columbia*, 2002 WL 648965 at *5 (D.D.C. Apr. 15, 2002) (same).

## B.    Judicial Estoppel Does Not Apply To Any Of The Materials Cited By KPMG.

Against that backdrop, accepting KPMG's judicial estoppel argument would require a vast and unwarranted expansion of the doctrine. KPMG advances the novel and unsupported theory that judicial estoppel applies to all sorts of out-of-court statements, regardless of whether they were offered to or accepted by a court, as long as the statements were "forceful," "unequivocal," "without qualification," and/or "candid[]." KPMG Br. 2-3. Moreover, KPMG seeks to apply the doctrine not to specific facts asserted in particular briefs, but to vast reports containing thousands of pages of contested facts and disputed inferences. No case of which

Fannie Mae is aware, and certainly no case cited by KPMG in its motion, remotely supports KPMG's unprecedented interpretation of judicial estoppel.

> **1.  Judicial Estoppel Does Not Apply To Documents That Never Were Offered In Court.**

KPMG maintains that Fannie Mae is judicially estopped from adopting a position inconsistent with the statements contained in the Rudman Report because of statements contained in four documents that *never have been offered to a court* or other adjudicative body: Two statements issued by Fannie Mae executives when the Rudman Report was released in February 2006 (Exhibits A and B to KPMG's motion); a piece of prepared testimony delivered by a Fannie Mae executive to Congress in June 2006, some months after the Rudman Report was released (KPMG Exhibit C); and Fannie Mae's 2006 Form 10-K.  *See* KPMG Br. 7, 18-19.

Fannie Mae disputes that its position in the Complaint contradicts any statement made by Fannie Mae, but the dispositive point here is that those documents never were offered to – much less relied upon by – any court or adjudicatory body.  The doctrine of judicial estoppel thus does not apply.  *See, e.g., New Hampshire*, 532 U.S. at 750 (to invoke judicial estoppel, the party must have succeeded "in persuading *a court* to accept that party's earlier position") (emphasis added); *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000) (judicial estoppel "applies only to inconsistent positions adopted in litigation" and not to statements to the public); 18B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4477, at 551 (2d ed. 2002) ("As the label implies, judicial estoppel arises only from a position taken in an adjudicatory proceeding.").

Nonetheless, KPMG asserts that this Court can consider the various press and other statements and thereby bootstrap every statement in the Rudman Report because the law is "well-settled" that "judicial estoppel can be used to protect the judicial process from . . .

statements made outside of court."  (KPMG Br. 19.)  That assertion is simply wrong, and the cases that KPMG cites offer no support at all.  *See* KPMG Br. 19-20.  For example, *Musler v. Georgeff*, 233 F. Supp. 2d 727 (D. Md. 2002), *aff'd*, 212 F.R.D. 287 (D. Md. 2003), addressed a litigant trying to reverse course on a statement made to the Tax Court.  *Id.* at 731-32.  *King v. Herbert J. Thomas Memorial Hospital*, 159 F.3d 192 (4th Cir. 1998), addressed a litigant trying to reverse a position adopted during an *adjudication* of disability benefits by the Social Security Administration.  *Id.* at 197-98.  *Edwards v. Aetna Life Insurance Co.*, 690 F.2d 595 (6th Cir. 1982), does not hold (as KPMG maintains, *see* KPMG Br. 19) that "unsworn statements" may be the subject of judicial estoppel.  To the contrary, the opinion concludes that a litigant *cannot* be estopped from contradicting a statement made to obtain a settlement with a federal administrative agency because an "administrative settlement does not amount to a judicial or quasi-judicial endorsement of [the litigant's] initial position."  690 F.2d at 600.  *Allen v. Zurich Insurance Co.*, 667 F.2d 1162 (4th Cir. 1982), applied judicial estoppel to a statement made to a *state court* and did not even decide whether the litigant's statements in administrative proceedings would warrant the same treatment.  *Id.* at 1167 n.3.  *Konstantinidis v. Chen*, 626 F.2d 933, 940 (D.C. Cir. 1980), involved statements made in prior state administrative proceedings and before a state court (and rejected the judicial estoppel arguments in any event).  In short, no case has ever applied "judicial estoppel" to press statements and the like, and KPMG's suggestion to the contrary is simply disingenuous.

Nor does KPMG cite any case that has applied judicial estoppel to statements in an ordinary SEC filing, such as Fannie Mae's Form 10-K.  Indeed, for decades, courts have held precisely the contrary.  *See, e.g.*, *Stella v. Graham-Paige Motors Corp.*, 259 F.2d 476, 481-82 (2d Cir. 1958) (rejecting the argument that judicial estoppel "encompasses extrajudicial

statements made to government agencies" and holding that application of judicial estoppel to statements in SEC filings "would extend estoppel beyond all reasonable bounds"); *Lewis v. Realty Equities Corp. of New York*, 396 F. Supp. 1026, 1030 (S.D.N.Y. 1975) (holding that defendant "is not estopped by its statements in documents filed with the SEC and the IRS"); *see also Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354-55 (7th Cir. 1995) (district court properly refused to take judicial notice of a corporation's Form 10-K to resolve contested fact against defendant).

KPMG's effort to evade that case law, by characterizing the various statements as "admissions," does not change the analysis. Even if the statements could plausibly be viewed as "admissions," they at most would be "evidentiary admissions" for the purposes of the hearsay rule, not "judicial admissions" for the purposes of judicial estoppel. *See Piedmont Resolution, LLC v. Johnston, Rivlin & Foley*, 999 F. Supp. 34, 55 (D.D.C. 1998) (judicial admission is "by intention an act of waiver relating to the opponent's proof of the fact, and not merely a statement of assertion or concession made for some independent purpose" (quoting *McNamara v. Miller*, 269 F.2d 511, 515 (D.C. Cir. 1959))).  The difference is critical:  judicial admissions are binding; "[o]rdinary evidentiary admissions, on the other hand, may be controverted or explained by the party."  30B Michael H. Graham, *Federal Practice and Procedure* § 7026 at 328 (3d ed. 2000); *see also, e.g.*, *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995).  Again, to be clear, Fannie Mae contends that its SEC filings and other statements are fully consistent with its position in this litigation.  But to the extent KPMG disagrees, that is a factual dispute that cannot be resolved by invoking judicial estoppel.

The course urged by KPMG is thus incorrect.  The Court may not rely on what is at most an evidentiary admission to grant a Rule 12(b)(6) motion.  *See, e.g*., *Travel All Over The World*

*v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1430 n.6 (7th Cir. 1996) (reliance on joint status report at 12(b)(6) stage is impermissible because "plaintiffs' 'admissions' in the joint status report are not proper matters for judicial notice'" and "[t]o hold otherwise would render Rule 12(b)'s proscription against considering matters outside the pleadings nugatory").

### 2.    Judicial Estoppel Does Not Apply To The OFHEO Reports.

KPMG also argues that Fannie Mae is bound by a combination of judicial estoppel and judicial notice to each and every conclusion in the 2004 OFHEO Report (the "Interim Report"). *See* KPMG Br. 21.  In the securities fraud class action, Fannie Mae asked this Court to take judicial notice of various documents, including OFHEO Reports from 2001, 2002, and 2004, as well as numerous SEC filings, analyst reports, and newspaper articles.  According to KPMG, because this Court's largely granted Fannie Mae's motion, this Court should now treat as conclusively true all of the statements in all of those documents.  That argument is meritless.

At the threshold, KPMG quotes extensively from the 2006 OFHEO report in its motion to dismiss.  *See, e.g.*, KPMG Br. 5, 22-23.  However, the 2006 Report was published *after* Fannie Mae's motion for judicial notice.  KPMG does not contend that the 2006 Report was the subject of any Fannie Mae filing.  Thus, judicial estoppel cannot apply to the contents of the 2006 final report even under KPMG's theory.

Moreover, with respect to the documents actually covered by Fannie Mae's motion — including the OFHEO reports from 2001, 2002, and 2004 — KPMG's argument is absurd. Fannie Mae could not possibly have maintained, for example, that every statement in all of the reports is true because the facts set forth in the documents at issue in Fannie Mae's judicial notice motion are contradictory and thus could not all be correct in their entireties.  The 2002 and 2001 OFHEO Reports, for example, both conclude that Fannie Mae's accounting was entirely proper, while the 2004 OFHEO Report obviously concluded otherwise.  *Compare, e.g.*, 2001

OFHEO Report to Congress at 16-17 (Fannie Mae's audit functions "exceed safety and soundness standards"), *and* 2002 OFHEO Report to Congress at 23, 29 ("The scope of Internal and External Audit work performed is appropriate and comprehensive, and the audit work is documented and complete"), *with, e.g.*, 2004 OFHEO Report of Special Examiner of Fannie Mae at iv-vi, 90-92, 155 (identifying numerous flaws in Fannie Mae's accounting). Similarly, the pre-2004 SEC filings addressed in Fannie Mae's motion for judicial notice contain financial statements that were not correct — which is why they subsequently were restated. It is illogical for KPMG to contend that, when Fannie Mae argued for judicial notice, Fannie Mae was suggesting that this Court should (or even could) accept all of those contradictory statements as true. *See* Fed. R. Evid. 201; *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 830 (8th Cir. 2003) ("Such disputed papers should not be the subject of judicial notice on a motion to dismiss.").

To the contrary, as this Court well understood, Fannie Mae's motion for judicial notice involved a more limited request. Fannie Mae did not ask this Court to take judicial notice of the truth of all of the thousands of statements contained in the OFHEO Reports, the SEC filings, and the analysts' reports, but instead asked this Court take judicial notice of the fact that the documents were issued and that the documents contained the statements they contained. The reason for Fannie Mae's motion was that the very existence of the documents and the statements they contained was relevant to establish that plaintiffs had notice and knowledge of certain facts and to show that plaintiffs had not met their burden to allege a strong inference of scienter or recklessness. Fannie Mae did not argue that the Court was bound to accept the truth of each and every statement therein. *See In re Ark-La-Tex Timber Co.*, 2007 WL 766208, *6 (5th Cir. Mar. 15, 2007) (refusing to apply judicial estoppel where unspoken assumption that debtor owned certain items was neither a "position taken" nor an "argument made").

To argue the contrary position, KPMG points to Fannie Mae's reference to the "accuracy" of the three OFHEO reports. But that reference was in the context of authenticating the reports; it was not an effort by Fannie Mae to vouch for the truth of every statement contained therein. *See* 21B Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure*, § 5106.4, at 234 (2d ed. 2005) (noting that invocation of "judicial notice" is often just an imprecise way of accepting "the authenticity of a document").

KPMG also points to Fannie Mae's reliance on certain findings from the 2004 OFHEO Report in Fannie Mae's motion to dismiss in the securities action. *See* KPMG Br. 21; *id.* at 23 ("[H]aving relied on OFHEO's factual findings, . . . Fannie Mae cannot now dispute the accuracy of OFHEO's factual findings."). As KPMG knows — since it faced a subsequent version of the same complaint — the securities plaintiffs relied heavily on the Interim Report, and, indeed, the Report was attached as an exhibit to the securities plaintiffs' complaint. A defendant may quote freely from documents that are "referred to in the complaint," "central to plaintiff's claim," or "attached to the motion papers." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997). Because plaintiffs relied extensively on the OFHEO Reports in their Complaint, Fannie Mae was entitled to cite to the OFHEO Reports to put the allegations in the securities complaint in context. Here, of course, Fannie Mae's Complaint does not attach or rely on the OFHEO reports, and thus KPMG may not invoke them here.

Finally, if the Court had taken judicial notice of the truth of the statements in all of those documents (which the Court plainly did not), then those statements would not be subject to reasonable dispute by either KPMG or Fannie Mae. Yet KPMG argues that it "is not advocating that this Court accept the truth of every finding made in all of these reports; rather, KPMG

requests that *Fannie Mae* be estopped from denying what *Fannie Mae* has repeatedly admitted." KPMG Br. 24 n.7 (emphasis in original.)  KPMG cannot have it both ways.  Either the Court took judicial notice of the truth of the facts in the reports or it did not.  The Court clearly did not.

For all those reasons, judicial estoppel does not permit the wholesale evasion of Rule 12(b)(6), and thus the contents of the OFHEO reports are irrelevant to this motion.  Furthermore, even if those reports were taken as true, KPMG could not obtain dismissal of Fannie Mae's suit. That is because KPMG tells only half the story, larding its motion with selective, misleading, and irrelevant quotations from the OFHEO reports.  For example, KPMG neglects to mention that OFHEO found that *KPMG* was specifically aware of and approved critical accounting policies that were not GAAP-compliant — including those involving FAS 91 and FAS 133 — and that KPMG failed to perform its professional duties.  *See, e.g.*, 2006 OFHEO Report at 219 ("KPMG reviewed all of the proposed derivative and hedging transactions prior to the Enterprise's implementation of FAS 133"); *id.* at 212 ("despite KPMG's assertion that it was never provided a formal FAS 91 amortization policy for review, KPMG reviewed at least two of the non-GAAP provisions criticized in the September 2004 OFHEO report"); *see also id.* at 169-72, 219-20, 223.  KPMG's negligent approval of those policies lies at the very core of Fannie Mae's claim for damages.  *See, e.g.*, Compl. ¶¶ 6-10.[6]

---

[6] Similarly, even if the Rudman Report were considered at a later stage of this proceeding, the evidence will show that the Report found that KPMG was fully aware and approved of critical accounting policies that led to Fannie Mae's restatement.  *See, e.g.*, Rudman Report at 102 (KPMG "knew of, and accepted, [Fannie Mae]'s major accounting policies" concerning FAS 133); *id.* at 167 (KPMG was a part of the implementation process for hedge accounting "from the outset"); *id.* at 91 (KPMG was aware of and approved the key "precision threshold" policy for amortization accounting); *id.* at 248 ("Fannie Mae's policies regarding FAS 115 were available to its outside auditor and a copy of the policy appears in KPMG's workpapers"), *id.* at 250 (KPMG did not object to the FAS 115 accounting policies).

Accordingly, it is hardly surprising that OFHEO itself sees no inconsistency between its findings and Fannie Mae's claims of negligence here.  Immediately after Fannie Mae filed this lawsuit, OFHEO issued a public statement declaring that the Complaint's allegations were "appropriate and consistent" with its findings against KPMG.  *See supra* page 4 & n.1.

Therefore, although the OFHEO findings are irrelevant at this stage of the proceedings, it is clear that those findings — should their consideration ever become appropriate — will support rather than preclude Fannie Mae's right to recovery.

## CONCLUSION

KPMG's Motion to Dismiss should be denied.

Respectfully submitted.

_____/s/_____

JENNER & BLOCK LLP

Jerome L. Epstein (DC Bar #412824)
Ian Heath Gershengorn (DC Bar #448475)
Jenner & Block LLP
601 13th Street, N.W.
Suite 1200
Washington, D.C. 20005
202-639-6062 (voice)
202-639-6066 (fax)
jepstein@jenner.com

Ronald L. Marmer
C. John Koch
Jenner & Block LLP
330 N. Wabash Ave.
Chicago, IL  60611-7603
312-222-9350



2001 M Street, NW
Washington, DC 20036

Telephone 202 533 3000
Fax 202 533 8500

November 18, 2002

Mr. Thomas Gerrity
Chairman of the Audit Committee
Fannie Mae
4000 Wisconsin Avenue, N.W.
Washington, D.C. 20016

**PRIVATE**

This letter will confirm our understanding of our engagement to provide professional services to Fannie Mae.

**Audit Services**

We will issue a written report upon our audit of the balance sheets of Fannie Mae as of December 31, 2003 and 2002, the related statements of income, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2003, all of which are to be included in the annual report (Form 10-K) proposed to be filed by Fannie Mae under the Securities Exchange Act of 1934.

We will conduct the audit in accordance with auditing standards generally accepted in the United States of America, with the objective of expressing an opinion as to whether the presentation of the financial statements, taken as a whole, conforms with accounting principles generally accepted in the United States of America. It should be understood that our report and the financial statements and schedules may be subject to review by the Securities and Exchange Commission staff and to the application by them of their interpretation of the relevant rules and regulations.

In conducting the audit, we will perform tests of the accounting records and such other procedures as we consider necessary in the circumstances to provide a reasonable basis for our opinion on the financial statements. We also will assess the accounting principles used and significant estimates made by management, and evaluate the overall financial statement presentation.

Our report will be addressed to the board of directors and stockholders of Fannie Mae and will be in a form that is in accordance with the published rules and regulations of the Securities and



**KPMG**

Page 2
November 18, 2002
Mr. Thomas Gerrity

Exchange Commission.   We can not provide assurance that an unqualified opinion will be rendered.   Circumstances may arise in which it is necessary for us to modify our report or withdraw from the engagement.   In such circumstances, our findings or reasons for withdrawal will be communicated to the audit committee.

We will read the other information in your annual report (Form 10-K) and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the financial statements.   However, our audit does not include the performance of procedures to corroborate such other information (including forward-looking statements).

Fannie Mae agrees that all records, documentation, and information we request in connection with our audit will be made available to us, that all material information will be disclosed to us, and that we will have the full cooperation of Fannie Mae's personnel.   As required by auditing standards generally accepted in the United States of America, we will make specific inquiries of management about the representations embodied in the financial statements and the effectiveness of internal control, and obtain a representation letter from management about these matters.   The responses to our inquiries, the written representations, and the results of audit tests, among other things, comprise the evidential matter we will rely upon in forming an opinion on the financial statements.

The management of Fannie Mae has responsibility for the financial statements and all representations contained therein.   Management also is responsible for identifying and ensuring that Fannie Mae complies with laws and regulations applicable to its activities, for preventing and detecting fraud, for adopting sound accounting policies, and for establishing and maintaining effective internal control over financial reporting to maintain the reliability of the financial statements and to provide reasonable assurance against the possibility of misstatements that are material to the financial statements.

Our audit is planned and performed to obtain reasonable, but not absolute assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.   Absolute assurance is not attainable because of the nature of audit evidence and the characteristics of fraud.   Therefore, there is a risk that material errors, fraud (including fraud that may be an illegal act), and other illegal acts may exist and not be detected by an audit performed in accordance with auditing standards generally accepted in the United States of America.   Also, an audit is not designed to detect matters that are immaterial to the financial statements.

To the extent that they come to our attention, we will inform management about any material errors and any instances of fraud or illegal acts.   Further, to the extent that they come to our attention, we will inform the audit committee about fraud and illegal acts that involve senior



Page 3
November 18, 2002
Mr. Thomas Gerrity

management, fraud that in our judgment causes a material misstatement of the financial statements of Fannie Mae, and illegal acts, unless clearly inconsequential, that have not otherwise been communicated to the committee. In the case of illegal acts, which in our judgment would have a material effect on the financial statements of Fannie Mae, we are also required to follow the procedures set forth in the Private Securities Litigation Reform Act of 1995, which under certain circumstances would require us to communicate our conclusions to the Securities and Exchange Commission.

Management is responsible for adjusting the financial statements to correct material misstatements and for affirming to the auditor in the representation letter that the effects of any uncorrected misstatements aggregated by the auditor during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements being reported upon taken as a whole.

In planning and performing our audit, we will consider Fannie Mae's internal control in order to determine the nature, timing and extent of our audit procedures for the purpose of expressing an opinion on the financial statements and not to provide assurance on internal control.

While we are not being engaged to report on Fannie Mae's internal control and are not obligated to search for reportable conditions, we will communicate reportable conditions to you to the extent they come to our attention. Reportable conditions are significant deficiencies in the design or operation of internal control, which could adversely affect the organization's ability to record, process, summarize and report financial data consistent with the assertions of management in the financial statements. The definition of "reportable conditions" does not include potential future internal control problems, i.e., control problems coming to our attention that do not affect the preparation of financial statements for the period under audit.

**Quarterly Review Services**

We will review the condensed balance sheets of Fannie Mae as of March 31, June 30, and September 30, 2003, and the related condensed statements of income, stockholders' equity and cash flows for the quarterly and year-to-date periods then ended, which are to be included in the quarterly reports (Form 10-Q) proposed to be filed by Fannie Mae under the Securities Exchange Act of 1934. We will also review the selected quarterly financial data specified by Item 302 of Regulation S-K, which is required to be included in the annual report (Form 10-K) proposed to be filed by Fannie Mae under the Securities Exchange Act of 1934.

We will conduct our reviews in accordance with the professional standards set forth in Statement on Auditing Standards No. 71, as amended, issued by the American Institute of Certified Public Accountants. Our procedures will be substantially less in scope than an audit of financial



Page 4
November 18, 2002
Mr. Thomas Gerrity

statements performed in accordance with auditing standards generally accepted in the United States of America, and accordingly, we will not express an opinion on the Fannie Mae's quarterly financial information. Our review reports will contain a statement to that effect.

Our reviews will consist primarily of inquiries of Fannie Mae personnel and analytical procedures applied to financial data and we will require a representation letter from management. It should be understood that management is responsible for the representations contained in the Fannie Mae's quarterly financial information.

A review does not contemplate tests of internal controls or accounting records, tests of responses to inquiries by obtaining corroborating evidential matter, and certain other procedures ordinarily performed during an audit. Thus, a review does not provide assurance that we will become aware of all significant matters that would be disclosed in an audit.

Our review cannot be relied upon to disclose errors, fraud or illegal acts that may exist. However, to the extent that they come to our attention in completing our quarterly review procedures, we will inform management about any material errors and any instances of fraud or illegal acts. Further, to the extent that they come to our attention, we will inform the audit committee about fraud and illegal acts that involve senior management, fraud that in our judgment causes a material misstatement of the interim financial information, and illegal acts, unless clearly inconsequential, that have not otherwise been communicated to the committee.

If we become aware of matters during our review that cause us to believe that the interim financial information, filed or to be filed with the Securities and Exchange Commission is probably materially misstated as a result of a departure from accounting principles generally accepted in the United States of America, we will discuss the matter with management and, if appropriate, communicate such matters to the audit committee.

Upon completion of each review, we will issue a written report addressed to the board of directors and stockholders of Fannie Mae that will state whether we are aware of any material modifications that should be made to the quarterly financial information for it to be in conformity with accounting principles generally accepted in the United States of America. Should conditions preclude us from completing a review and consequently prevent us from issuing a report as contemplated by the preceding sentence, we will advise the audit committee of Fannie Mae promptly.

Fannie Mae agrees to include our review report in any document issued to stockholders or to third parties (including the Securities and Exchange Commission), that represents that the Fannie Mae's quarterly financial information was reviewed.



Page 5
November 18, 2002
Mr. Thomas Gerrity

\* \* \* \*

Our audit fee will be $1,245,000 including expenses and our fee for quarterly review services will be $100,000. The audit and quarterly review fees will be billed as agreed to with management. This fee estimate is based on the level of experience of the individuals who will perform the services. Circumstances encountered during the performance of these services that warrant additional time or expense could cause us to be unable to deliver them within the above estimates. We will endeavor to notify you of any such circumstances as they are assessed. Additionally, professional services beyond the scope of the audit and quarterly review services will be covered by separate engagement letters and will be billed separately.

The work papers for this engagement are the property of KPMG LLP (KPMG) and constitute confidential information. However, we may be requested to make certain work papers available to the Office of Federal Housing Enterprise Oversight (OFHEO) pursuant to authority given it by law or regulation. If requested, access to such workpapers will be provided under the supervision of KPMG personnel. Furthermore, upon request, we may provide photocopies of selected workpapers to OFHEO. OFHEO may intend, or decide, to distribute the photocopies of or information contained therein to others, including other governmental agencies.

In the event KPMG is requested pursuant to subpoena or other legal process to produce its documents relating to this engagement for Fannie Mae in judicial or administrative proceedings to which KPMG is not a party, Fannie Mae shall reimburse KPMG at standard billing rates for its professional time and expenses, including reasonable attorney's fees, incurred in responding to such requests.

We shall be pleased to discuss this letter with you at any time. For your convenience in confirming these arrangements, we enclose a copy of this letter. Please sign and return it to us.

Very truly yours,

KPMG LLP

*Mark Serock*

Mark Serock
*Partner*

cc:    Timothy Howard
       Leanne Spencer

**FILED**

SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAR - 3 2005

ALAN SLATER, ~~~~~~ ~~~ ~~~~~

*J. Jones*

BY J. JONES

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE – CENTRAL JUSTICE CENTER

| | |
|---|---|
| TARGUS GROUP INTERNATIONAL, INC.<br><br>Plaintiff,<br><br>vs.<br><br>KPMG LLP, et al.<br><br>Defendants. | Case No.  03CC02302<br>Assigned to Honorable Geoffrey T. Glass<br>Department C22<br><br>**ORDER DENYING DEFENDANT KPMG LLP'S MOTION FOR SUMMARY JUDGMENT AND SUMMARY ADJUDICATION ON THE CAUSES OF ACTION CONTAINED IN PLAINTIFF TARGUS GROUP INTERNATIONAL INC.'S COMPLAINT** |
| KPMG LLP,<br><br>Cross-Complainant,<br><br>vs.<br><br>TARGUS GROUP INTERNATIONAL, INC., et al.<br><br>Cross-Defendants. | Complaint Filed:    January 30, 2003 |

## I.    INTRODUCTION

The Court heard argument on November 9, 2004 on Defendant KPMG LLP's ("KPMG") motion for summary judgment and summary adjudication as to the claims in Targus Group International, Inc.'s ("TGII") Complaint against KPMG.   The Court took the matters under submission following the November 9 hearing and issued its tentative rulings on December 21, 2004.  Based on the papers and evidence submitted and the arguments of counsel, the Court now issues its final rulings.  For the reasons discussed below, KPMG's motion for summary judgment on the entire Complaint is **DENIED**.  KPMG's motion for summary adjudication as to certain claims contained in the TGII Complaint is also **DENIED**.

## II.    CASE SUMMARY

Between 1998 and 2001, William Anthony Lloyd ("Lloyd"), TGII's former Chief Financial Officer, embezzled millions of dollars from TGII before being caught, arrested, prosecuted, and sentenced to a United States federal prison term for such actions.  (TGII Complaint, ¶¶ 1-22.)   Based on TGII's losses resulting from Lloyd's embezzlement scheme, TGII has sued KPMG, TGII's external auditors, for committing professional negligence.  (Id.) TGII alleges that KPMG should have discovered Lloyd's fraudulent activities.  (Id.)  KPMG has also brought a cross-action against several cross-defendants, including TGII, which is not directly at issue in this Order.

## III.    SUMMARY JUDGMENT AS TO TGII'S COMPLAINT IS DENIED

KPMG moved for summary judgment because it did not think that TGII could establish causation with respect to its professional malpractice claim set forth in TGII's Complaint.  (TGII Complaint, ¶¶ 1-22.)   KPMG asserts that "justifiable reliance" is an element of TGII's accounting malpractice claim, and Lloyd's undisputed knowledge of his own fraudulent conduct prevents TGII from establishing justifiable reliance because such knowledge must be "imputed" to TGII.  (KPMG Points and Authorities, pp. 8:12-14:15.)  In addition, KPMG asserts that it is entitled to summary judgment on the grounds that TGII waived or released all claims in TGII's

1   Complaint through releases contained in the letters engaging KPMG to do accounting work for
2   TGII. (KPMG Points and Authorities, pp. 14:16-18:3.) KPMG's motion for summary judgment
3   on these grounds is **DENIED**.

4

5          **A.      Lloyd's Knowledge Cannot be Imputed to TGII**

6          In most instances, an innocent third party is entitled to sue a principal based upon the
7   agent's wrongdoings, even if the agent is acting adversely to the principal. KPMG uses this
8   doctrine to try to impute Lloyd's knowledge of the fraud to TGII as the principal. If TGII knew of
9   the fraud, even if only impliedly, then KPMG's failure to find the fraud causes TGII no damage.
10  The Court rejects that argument.

11         Everyone agrees that Lloyd was acting adverse to TGII's interest. Lloyd embezzled
12  millions of dollars from TGII during the time periods in which KPMG was auditing TGII's
13  consolidated financial statements. (TGII SSUF Nos. 122, 123, 212, 226; KPMG AUF No. 58;
14  Lloyd Depo., pp. 15:23-16:8, 49:6-52:3, 630:18-632:16, 749:9-749:19, relevant portions
15  attached to the Dean Decl. as Exhibit "I"; Lloyd Plea Agreement, attached to the Miller Decl. as
16  Exhibit "LL"; First Affidavit of Hassan Pey, ¶¶ 5-35, attached to the Miller Decl. as Exhibit "F".)
17  It is also undisputed that Lloyd's conduct, including the representations made by Lloyd in the
18  Management Representation Letters, was criminal in nature and was executed by Lloyd for his
19  own personal gain. (TGII SSUF Nos. 122, 123, 212, 226, 223; KPMG AUF No. 58; Lloyd
20  Depo., pp. 15:23-16:8, 49:6-52:3, 630:18-632:16, 749:9-749:19, relevant portions attached to
21  the Dean Decl. as Exhibit "I"; Lloyd Depo, pp 786:22-787:1, relevant portions attached to the
22  Miller Decl. as Exhibit "D"; Lloyd Plea Agreement, attached to the Miller Decl. as Exhibit "LL";
23  First Affidavit of Hassan Pey, ¶¶ 5-35, attached to the Miller Decl. as Exhibit "F"; KPMG
24  Opposition, pp. 3:20-4:27) Lloyd's theft of millions of dollars from TGII was clearly adverse to
25  TGII and TGII did not reap any benefit from Lloyd's actions.

26         The relevant inquiry is whether KPMG can "impute" Lloyd's wrongful conduct to TGII. If
27  it can, then it may be able to avoid liability for the claims of professional negligence against it.

28

ORDER DENYING DEFENDANT KPMG LLP'S MOTION FOR SUMMARY JUDGMENT AND SUMMARY
ADJUDICATION ON THE CAUSES OF ACTION CONTAINED IN PLAINTIFF TARGUS GROUP
INTERNATIONAL INC.'S COMPLAINT

1    The Court rejects KPMG's position that it is an "innocent party" to the fraudulent

2    transactions and finds that KPMG cannot rely on the imputation of Lloyd's knowledge of his

3    fraud to TGII as a defense for the claims of TGII.  The Court finds that an accountant, hired to

4    audit the books and required to report fraud, is not an innocent party, in the sense that KPMG

5    is not naïve to the possibility of fraudulent misrepresentations by agents of TGII, adverse to

6    both TGII and KPMG.

7    This is not to be taken as a suggestion that KPMG was guilty of any sort of complicity in

8    Lloyd's fraud.  The Court has not evidence before it that KPMG knew of the fraud, let alone

9    participated in it.  The Court merely finds that the law does not allow KPMG to assume, without

10   questioning, that Lloyd's actions were the actions of TGII.

11   If KPMG is not an innocent third party, then it cannot charge TGII with knowledge of

12   Lloyd's fraud. "An agent can never have authority, either actual or ostensible, to do an act

13   which is, and is known or suspected by the person with whom he deals, to be a fraud upon

14   the principal." Ca. Civ. Code §2306; People v. Zimmer, 23 Cal. App. 2d 581, 585 (1937).

15   When the third party knows or suspects fraud on the principal, knowledge acquired by an

16   agent in the course of defrauding his principal cannot be imputed to the principal.  Id.;

17   Redman v. Walters, 88 Cal. App. 3d 448, 454 (1979).  Likewise, knowledge of a corporate

18   officer gained while acting adversely to the corporation generally is not imputed to the

19   company in dealings with complicit third parties.  Meyer v. Glenmoor Homes, Inc., 246 Cal.

20   App. 2d 242, 264 (1967) (". . . knowledge acquired by the agent who is acting adversely to

21   the principal will not be attributed to the principal."); People v. Park, 87 Cal. App. 3d 550,

22   566, (1978) (where agent acts along in his own interest or his interests are adverse to the

23   principal, no knowledge will be imputed); see FDIC v. O'Melveny & Meyers, 969 F.2d 744,

24   750 (9th Cir. 1992) ("O'Melveny I") (applying California law); In re Sharp International Corp. v.

25   KPMG LLP, 278 B.R. 28 (E.D. N.Y. 2002) (applying New York law).

26   The ability of an innocent third party to impute the knowledge from an agent to a

27   principal is based upon the necessities of general commercial relationships, where the third

28   party is relying on the agent to speak for the principal, and the notion that, "[g]enerally, all

4

1  knowledge which an agent in good faith ought to communicate to his principal will be imputed

2  to the principal *against innocent third parties*." <u>Wagner v. Benson</u>, 101 Cal. App. 3d 27, 35

3  (1980) (Citation omitted.) (Emphasis added.).  The <u>O'Melveny I</u> court held that imputation and

4  other equitable arguments would "not apply because O'Melveny is not an innocent third party

5  in this case.  *Cases where innocent victims of an agent's wrongdoing sue the principal are*

6  inapposite in this case." <u>O'Melveny I</u>, 969 F.2d at 752, n. 8 (Emphasis added). <u>O'Melveny I</u>

7  was rooted in the fiduciary relationship between an attorney and his client, but the statement of

8  the rule transcends those facts.

9       Here, KPMG was hardly in a position to rely on Lloyd to speak conclusively for TGII.

10 Part of KPMG's undisputed role in its audits was to review TGII's financial statements and

11 other financial books and records and to perform tests to obtain reasonable assurance that the

12 financial statements were free from material misstatement due to error or fraud.  (TGII SSUF

13 No. 37; Dibble Decl., Ex. A, p. 1; Dibble Decl., Ex. C, p. 1; Hori Decl., Ex. F, p. 1; KPMG

14 Opposition, pp. 5:1-6:4; KPMG Audit Opinions on TGII's Consolidated Financial Statements,

15 attached to the Cartwright Decl. as Exhibits "J-N".)  "Professional skepticism" is the term of art

16 which describes an accountant's duties in this regard.  <u>See</u> Cal. Code of Regs., Tit. 16, § 58

17 ("Licensees engaged in the practice of public accountancy shall comply with all applicable

18 professional standards, including but not limited to generally accepted accounting principles

19 and generally accepted auditing standards."); <u>see also</u> American Institute of Certified Public

20 Accountants, AICPA Professional Standards, AU § 316 (auditor has duty to obtain reasonable

21 assurance that financial statements are free of material misstatements due to fraud), § 230.7

22 (auditor must engage in professional skepticism).  Moreover, the letters by which TGII hired

23 KPMG say that "an audit is planned and performed to obtain reasonable assurance about

24 whether the financial statements are free of material misstatement, whether caused by error or

25 fraud." (Dibble Decl., Exs. A, C; Hori Decl., Ex. F.)  These same engagement letters also state

26 that KPMG had a duty to report to TGII any material fraud which it uncovered during the

27 course of its audits.  (Dibble Decl., Exs. A, C; Hori Decl., Ex. F.)

28

ORDER DENYING DEFENDANT KPMG LLP'S MOTION FOR SUMMARY JUDGMENT AND SUMMARY
ADJUDICATION ON THE CAUSES OF ACTION CONTAINED IN PLAINTIFF TARGUS GROUP
INTERNATIONAL INC.'S COMPLAINT

1   KPMG was obligated, among other things, to report fraud by agents or employees.

2   KPMG cannot simply impute to TGII the very fraud it did not find.   Due to its various

3   professional and contractual duties, KPMG cannot treat TGII and Lloyd as one entity, as the

4   truly ignorant or naive third party victim could.   KPMG, as an auditor, was duty bound to the

5   principal to be cautious, if not skeptical, of any agent's representations, including those of

6   Lloyd.  Indeed, KPMG had an obligation as an auditor to evaluate the books and records of

7   TGII for the very same conduct that KPMG now claims absolves it.   Accordingly, the innocent

8   party exception asserted by KPMG cannot apply under the circumstances of this case.

9   Another way to look at it is to recognize that KPMG was an agent of TGII with a

10  contractual obligation to report to TGII any fraud that it finds during its professional work.  Lloyd

11  also was an agent of TGII with an obligation to report fraud. Where two agents share a

12  particular responsibility to a principal, the imputation doctrine should not allow the knowledge

13  of fraud by one agent to be imputed to the joint principal, allowing the second agent to avoid

14  her responsibility. That is, imputation only favors those who truly rely on an agent to speak for

15  the principal: those whom the law allows, by virtue of their arm's length relationship,  to remain

16  blissfully ignorant of the inner workings of the other party.   KPMG, on the other hand, had

17  contractual and professional obligations that required it to look past TGII as a monolith and to

18  understand and question the actual relationship between TGII and its agents.

19  The Court further notes that the forgoing analysis is independent of whether KPMG was

20  negligent or not.  This Court makes no findings in deciding this motion as to whether KPMG

21  met its professional obligations.

22  Since this motion only dealt with imputation of Lloyd's knowledge to TGII , the Court

23  does not address in this ruling (but has addressed in other rulings on this case) whether TGII is

24  liable to KPMG under respondeat superior.

25

26  **B.    The Alleged Release Does Not Bar TGII's Complaint**

27  KPMG also claims that the release in its engagement contracts bars TGII's claims

28  against it.  The Court finds that the release is not void as a matter of public policy, but also

1   finds the release does not apply to TGII's claims of negligence against KPMG.

2       The Court is obligated to construe the release narrowly, as it was drafted by KPMG. On

3   its face, the release applies only to liability for injuries "attributable to any misrepresentations in

4   the representation letter." (TGII SSUF Nos. 245-246; Miller Decl., Exhibits "RR-UU".) The

5   Court rules that KPMG's obligations to obtain reasonable assurance that the financial

6   statements are not materially misstated by error or fraud contain elements that are

7   unquestionably independent of any alleged reliance by KPMG on any misrepresentations by

8   Lloyd in the Management Representation Letters. (Dibble Decl., Exs. A, C; Hori Decl., Ex. F.);

9   Cal. Code of Regs., Tit. 16, § 58 ("Licensees engaged in the practice of public accountancy

10  *shall comply with all applicable professional standards, including but not limited to generally*

11  *accepted accounting principles and generally accepted auditing standards.*"); see also

12  American Institute of Certified Public Accountants, AICPA Professional Standards, AU § 316

13  (auditor has duty to obtain reasonable assurance that financial statements are free of material

14  misstatements due to fraud), § 230.7 (auditor must engage in professional skepticism). Since

15  KPMG's obligations to conduct its audits in compliance with applicable auditing standards

16  *contain elements that are independent of any reliance by KPMG on the Management*

17  Representation Letters, the release does not apply to damages claimed to have resulted from

18  KPMG's failure to conduct its audits properly. (TGII SSUF Nos. 130-135, 147, 205; 1998-2000

19  Management Representation Letters, attached to the Miller Decl. as Exhibits "I-K"; Johnson

20  Decl., ¶¶ 15-16; Cartwright Decl., ¶¶ 20-21.)

21      The Court rules that the release is limited to claims against KPMG arising out of its

22  reliance on Lloyd's statements in the representation letters.  TGII's complaint does not

23  appear to include such claims, but, to the extent that it does, TGII cannot recover for them.

24  The Court does not interpret the release to allow KPMG to absolve itself for all liability to

25  TGII, only the liability due to its reliance on Lloyd's misrepresentations in the representation

26  letters.

27      Accordingly, since the motion for summary adjudication based upon the release would

28

7

1   not result in a final determination as to a complete cause of action, the motion is **DENIED**.

2

3   **IV.    SUMMARY ADJUDICATION AS TO THE MALPRACTICE CLAIM IS DENIED**

4       **A.    The Court Rejects KPMG's Causation Arguments**

5           *In addition to seeking summary judgment as to the TGII Complaint on the causation*

6   issue, KPMG also seeks summary adjudication with respect to TGII's "audit-related"

7   malpractice claims. (KPMG Notice of Motion, pp. 1:18-1:24; KPMG Points and Authorities, pp.

8   19:5-19:13.)  For the same reasons discussed above in Section IV, the Court rejects KPMG's

9   arguments as to the causation issue and therefore **DENIES** summary adjudication.  Lloyd's

10  *knowledge is not imputable to TGII as a matter of law.*

11

12      **B.    The Court Rejects KPMG's Statute of Limitations Argument**

13          As additional grounds for summary adjudication, KPMG argues that the statute of

14  limitations bars TGII's "audit-related" malpractice claims.  KPMG argues that each audit year in

15  question must be viewed as a "separate cause of action" and that Lloyd's knowledge is

16  imputable to TGII.  Therefore, KPMG reasons, with respect to the 1998 and 1999 audits in

17  question, TGII's claims are barred by the two year statute of limitations for malpractice claims.

18          The Court rejects KPMG's arguments for summary adjudication based on the statute of

19  limitations for four reasons.  First, the Court is not persuaded that independent "sub-counts,"

20  capable of being adjudicated separately, exist. KPMG has failed to submit any evidence

21  whatsoever as to the tax issues so the Court cannot rule on that possibility.  Second, while it is

22  true that section 437c(f) of the California Code of Civil Procedure may allow a party in certain

23  cases to challenge on a motion for summary adjudication each separate and distinct wrongful

24  act, KPMG has not established that each audit cycle constitutes a distinct, separate wrongful

25  act.  The Court finds that the audit malpractice allegations in TGII's Complaint are not

26  independent claims bundled into one cause of action.  See e.g. DeCastro West Chodorow &

27  Burns, Inc. v. Superior Court, 47 Cal. App. 4th 410, 422 (1996).

28          Third, as to substance, for the same reasons discussed above in Section III, the Court

1   rejects KPMG's arguments that Lloyd's knowledge is imputable to TGII.  Lloyd's knowledge is
2   not imputable to TGII as a matter of law.

3          Fourth, the point at which a party either knew or should have known of the defendant's
4   negligence is generally a question of fact.  <u>See</u> Call v. Kezirian, 135 Cal. App. 3d 189, 196
5   (1982).  In cases involving professional malpractice, "the degree of diligence in ferreting out
6   the negligence for the purpose of the statute of limitations is diminished." <u>Id.</u> at 196.  Given the
7   bulk of disputed evidence submitted by both parties, whether TGII knew or should have known
8   of Lloyd's fraudulent conduct is a question for the trier of fact.  (<u>See</u>, <u>e.g.</u>, TGII Responses to
9   Separate Statement Nos. 63-66; TGII AUF Nos. 231-233.)  As numerous disputed assertions
10  and facts exist on this issue, the Court cannot rule as a matter of law as to when TGII knew or
11  should have known of the fraud.  Accordingly, for all of the foregoing reasons, KPMG's motion
12  for summary adjudication is **DENIED**.

13

14  **V.    CONCLUSION**

15         Based on the matters submitted to it and the law of the State of California, the Court
16  **DENIES** KPMG's motions for summary judgment and summary adjudication as to TGII's
17  claims against it.

18

19  **VI.   OBJECTIONS**

20         The Court overrules all objections to the evidence relied on it in its ruling.

21

22
    Dated:  3/3/05
23                                          HONORABLE GEOFFREY T. GLASS
24                                          Superior Court of the State of California
                                            County of Orange
25

26

27

28

                                            9





© 2002 KPMG LLP, the U.S. member firm of KPMG International, a Swiss nonoperating association. All rights reserved. 02-05-24

**To Audit Committee Members and Other Participants in the Financial Reporting Process:**

During the last few months, the issue of corporate governance—and especially the role of the audit committee—has been dominated by reactions to three major events: the collapse of Enron and other high-profile financial restatements, new risk perceptions due to the tragic events of September 11, and the 2001 economic downturn and its impact on financial reporting. Each of these events has resulted in significant shareholder interest in the audit committee and how it might be improved to minimize similar risks at their companies. These events have also been a focus of the media, regulators, legislators, and other groups interested or involved in corporate governance.

In response, audit committee members have been more focused than ever on enhancing both the effectiveness and efficiency of their audit committees, including improving the interaction of the audit committee with management, internal audit, and the external auditors. The importance of a dynamic audit committee process was one of the primary messages heard from the approximately 1,600 attendees at KPMG's Audit Committee Roundtable Spring 2002.

Much of the current debate and dialogue offers recommendations and "best practices" for improving the effectiveness of the audit committee in overseeing a company's financial reporting process. While such advice is well intentioned, KPMG's Audit Committee Institute (ACI) urges caution in attempting to adopt each and every generic "best practice."

ACI encourages corporate leaders to consider these Basic Principles for Audit Committees, which we believe provide the foundation for, and the framework within which, each audit committee develops and adopts its own "best practices" that support its independent and objective oversight of the financial reporting process.

The Audit Committee Institute Web site at www.us.kpmg.com/auditcommittee contains more depth of coverage on many of the issues addressed by the Basic Principles for Audit Committees. As you review this document, please feel free to share with us any comments or suggestions you may have on these basic principles or for making our Web site, *Audit Committee Quarterly*—or the Institute—better. Please fax your comments or suggestions to KPMG's Audit Committee Institute at 201-505-2284, or e-mail them to auditcommittee@kpmg.com.

# BASIC PRINCIPLES FOR AUDIT COMMITTEES

© 2002 KPMG LLP, the U.S. member firm of KPMG International, a Swiss nonoperating association. All rights reserved. 02-05-24

## 1 Recognize that the dynamics of each company, board, and audit committee are unique—one size does not fit all.

The organization and operational approach followed by any audit committee should take into account the unique aspects of the organizational and governance structures of the company that the committee serves.

In addition, the delegation of responsibilities to an audit committee by the board of directors must be explicit and responsive to the needs and culture of the company and the board as a whole.

The basic responsibilities of an audit committee are to oversee the financial reporting process of the company as implemented and maintained by management, including risks and controls related to that process, and the internal and external auditors' roles and responsibilities within the financial reporting process. The audit committee should not be overloaded with activities or the committee may (1) lose sight of its major objectives or (2) perform its duties superficially.[1]

Once delegated, the ongoing support of the board for the activities of the audit committee, including appropriate management interaction, is critical.

## 2 The board must ensure the audit committee comprises the "right" individuals to provide independent and objective oversight.

It is the responsibility of the board of directors to ensure that audit committee members are independent, financially literate, and have the characteristics to serve as effective audit committee members.

---

[1] Frank M. Burke and Dan M. Guy, *Audit Committees: A Guide for Directors, Management, and Consultants*, 2nd edition (New York: Aspen Law & Business, 2002), p. 117.

The 1987 "Report of the National Commission on Fraudulent Financial Reporting" (known as the "Treadway Commission Report") captured the basic attributes that every audit committee should possess. The audit committee must be **informed**, **vigilant**, and **effective** overseers of the financial reporting process. To have those attributes, the individual members of the committee must possess certain characteristics. First, the individual should have a general understanding of the company's major economic, operating, and financial risks. In addition, the individual should have a broad awareness of the interrelationship of the company's operations and its financial reporting. Further, the audit committee member should understand the difference between the oversight function of the committee and the decision-making function of management.

Audit committee members must have the ability to formulate and ask probing questions about the company's financial reporting process. According to the 1999 Blue Ribbon Committee on Improving the Effectiveness of Corporate Audit Committees (Blue Ribbon Committee), a member's ability to ask and intelligently evaluate the answers to the necessary questions hinges on intelligence, diligence, a probing mind, and financial literacy. In fact, perhaps the most important characteristic of a good audit committee member is a willingness to challenge management when necessary. This is the essence of independence.

## 3 The board and audit committee must continually assert that, and assess whether, the "tone at the top" embodies insistence on integrity and accuracy in financial reporting.

The company must have the "right tone at the top." What is the right tone at the top from the perspective of the audit committee and its oversight of the financial reporting process?

The audit committee, as a check and balance on management, is the guardian of the company's financial reporting integrity. Thus, in establishing the "right tone," according to

# A FRAMEWORK FOR YOUR "BEST PRACTICES"

© 2002 KPMG LLP, the U.S. member firm of KPMG International, a Swiss nonoperating association. All rights reserved. 02-05-24

Michael R. Young, a litigation partner of Willkie Farr & Gallagher and counsel to the American Institute of Certified Public Accountants, the company must have an unrelenting insistence:

- On accuracy in financial reporting
- That numbers and financial statements not be massaged or manipulated
- On truthfulness as the foremost objective of the company

Young says, "It is a tone that makes financial misreporting unthinkable."[2]

## 4 The audit committee must demand and continually reinforce the "ultimate accountability" of the external auditor to the board and audit committee as representatives of shareholders.

The ultimate accountability of the external auditor to the board and the audit committee must be more than words in the audit committee charter. The audit committee, external auditor, and senior management must all acknowledge this reporting relationship and "allegiance" by their actions and deeds.

## 5 Audit committees must implement a process that supports their understanding and monitoring of the:

- **Specific role of the audit committee in relation to the specific roles of the other participants in the financial reporting process (oversight)**
- **Critical financial reporting risks**
- **Effectiveness of financial reporting controls**
- **Independence, accountability, and effectiveness of the external auditor**
- **Transparency of financial reporting**

The audit committee process provides a framework for coordinating the activities of, and information provided by, the participants in the financial reporting process that support the audit committee's understanding, and monitoring, of the "key risks and controls" related to the company's financial reporting process. A strong audit committee process allows a company, including its shareholders, to benefit from the collective insight and experience of each member of the committee.

The Blue Ribbon Committee described the participants in the financial reporting process as a "three-legged stool of responsible disclosure and active oversight." The three legs are (1) management, including internal audit, (2) the independent external auditor, and (3) the audit committee. The audit committee must not only understand the specific and unique roles that each "leg" plays in the financial reporting process but also hold these participants accountable to the board and the audit committee.

When a company establishes an audit committee and the board delegates oversight of the financial reporting process to the committee, implicit in that delegation decision is that the audit committee is thereby assigned oversight responsibility for financial reporting risks (including fraud risks) and controls related to those risks. Therefore, the audit committee must have an understanding of (1) significant risks related to financial reporting reliability and (2) the controls that the company has established to address those risks.

With a well-defined **process** predicated on an understanding of the specific roles of management, including the internal auditor and the external auditor, the audit committee will have established the framework within which to *exercise effective oversight—listen, ask, assess, and challenge.*

---

[2] Michael R. Young, *Accounting Irregularities and Financial Fraud*, 2nd edition (New York: Aspen Law & Business, 2002), p. 231.





KPMG's Audit Committee Institute (ACI) has been communicating with audit committee members since our formation more than three years ago. Our programs have allowed us to meet directly with thousands of directors and officers. ACI's initiatives include semiannual Roundtables, publication of *Audit Committee Quarterly*, conference and board presentations, a toll-free hotline (**877-KPMG-ACI**), periodic distribution of time-sensitive information, and our Web site, **www.us.kpmg.com/auditcommittee**.

© 2002 KPMG LLP, the U.S. member firm of KPMG International, a Swiss nonoperating association. All rights reserved. 02-05-24